## BALTIMORE & OHIO RAILWAY CO. *v.* JACKSON.

No. 370.   Argued March 28, April 1, 1957.—Decided May 13, 1957.

*Stephen Ailes* argued the cause and filed a brief for petitioner.

*Milford J. Meyer* argued the cause for respondent. With him on the brief was *Irving L. Chasen.*

*Robert W. Ginnane* and *Charlie H. Johns* filed a brief for the Interstate Commerce Commission, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a suit for damages arising from an injury suffered by a section foreman of the petitioner while operating a motor track car that was towing a push truck on petitioner's tracks. It was brought under the Federal Employers' Liability Act. The sole question is whether such vehicles when used in the manner here are within the coverage of the Safety Appliance Acts.[1] The petitioner contends that neither vehicle comes within the general coverage of the Acts; and, in the alternative if the vehicles are included, that they are exempted as "four-wheel cars" under § 6 of the Acts.[2]

Both the trial court and the Court of Appeals have decided that the vehicles involved here are included within the coverage of the Safety Appliance Acts and that neither falls within any exemption contained therein. The case reaches us on certiorari, 352 U. S. 889. We agree with the two-court interpretation of the Acts as applied to the facts here involved.

---

[1] 27 Stat. 531, as amended, 45 U. S. C. §§ 1–16.

[2] 27 Stat. 532, as amended, 29 Stat. 85, 62 Stat. 909, 45 U. S. C. § 6, provides in part:

"That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this Act, shall be liable to a penalty . . . : *Provided,* That nothing in this Act contained shall apply to trains composed of four-wheel cars or to trains composed of eight-wheel standard logging cars where the height of such car from top of rail to center of coupling does not exceed twenty-five inches, or to locomotives used in hauling such trains when such cars or locomotives are exclusively used for the transportation of logs."

The respondent was injured over five years ago. For 39 years he had been a section foreman of track maintenance for petitioner. He and the crew over which he had supervision were responsible for the maintenance and repair of a section of track between Waring and Durwood, Maryland. They used in their work a gasoline-motor-powered track car equipped with belt drive and a hand brake. The car could carry as many as 12 men and their tools. At various times a push truck or hand car was coupled by a pin to the motor track car and was towed by it to the scene of the work. The hand car weighed about 800 pounds unloaded, had a 5-ton carrying capacity, and had no brakes. Sometimes it carried a load of material and other times only equipment and tools. Each of these cars was equipped with four wheels and was capable of being removed from the rails by a crew of men.

On the occasion in question respondent and a crew of two men, pursuant to orders, had hauled about a ton of coal via the motor track car and hand car from Gaithersburg to the stationmaster at Washington Grove, a station near the scene of their roadbed work on that day. The coal was placed on the hand car which was pulled along the tracks by the motor car. The two vehicles also carried tools, a wheelbarrow, and other equipment, as well as the respondent and his crew. After unloading the coal they proceeded a short distance beyond the Washington Grove station to work on a section of the westbound track. There they removed the vehicles from the track and worked that section of the rails until about 4 p. m. They then replaced the vehicles on the tracks, fastened them together, and began the return trip to the yards at Gaithersburg. On approaching the Washington Grove station at a speed of from 5 to 10 miles per hour the vehicles struck a large dog and derailed, throwing the respondent into a ditch and causing his injuries. The

uncontradicted evidence was that respondent applied the hand brake on the motor track car immediately upon seeing the dog and the cars skidded on wet tracks about 39 feet before the impact. Respondent further testified that the motor track car alone, without the hand car attached, could have been stopped under the same conditions within six to eight feet.

Respondent brought his action against the railroad claiming that (1) the petitioner was negligent in directing him to operate a motor track car and push truck without sufficient braking power, and in requiring him to pull the push truck over wet, slippery rails when the truck was not equipped with brakes, and (2) the injury was proximately caused by petitioner's noncompliance with the requirements of the Safety Appliance and Boiler Inspection Acts. The District Court ruled and instructed the jury that the provisions of the Safety Appliance Acts included within their coverage the vehicles in question. The issues in both causes of action were submitted to the jury, which returned with a verdict for respondent on "the issues aforesaid." The appeal in the Court of Appeals was directed only to the second cause of action concerning the applicability of the Safety Appliance Acts. That court affirmed, 98 U. S. App. D. C. 169, 233 F. 2d 660, and as has already been indicated, we are faced here only with the problem of the coverage of the Safety Appliance Acts.

The power or train brake provisions of the Safety Appliance Acts apply to the motor track car and the coupling and brake requirements to the hand car when they are employed in the manner here involved. If used separately, though we do not pass on the question, it may well be that entirely different sections of the Acts might apply to each of the vehicles. But here the hand car was not operated by hand as was originally intended.

On the contrary, it was fastened by a pin—not a coupler—
to a motor track car, a self-propelled piece of equipment,
and was hauled with its cargo to its destination on the
tracks of petitioner. The hand car had no brakes,
although the Acts specifically require "any car" to be
equipped with a hand brake.[3] It was being used for
hauling purposes. Furthermore, the motor track car,
instead of being used solely to carry men and tools to
their place of work, was used to pull or tow another car—
albeit a hand car. It had no power or train brakes but
was equipped with a simple hand brake designed for its
individual operation. The brake was wholly insufficient
for the use to which the railroad put the vehicles.

We believe that the controlling factor is the nature of
the employment of the vehicles in the railroad's service,
that is the type of operation for which they are being
used. Here at the time of the injury it is admitted that
petitioner was putting the motor track car to locomotive
uses in pulling a hand car used to haul material, tools,
and equipment. In the light of the prime purpose of the
Safety Appliance Acts, *i. e.,* "the protection of employees
and others by requiring the use of safe equipment," *Lilly* v.
*Grand Trunk R. Co.,* 317 U. S. 481, 486 (1943), when the
railroad uses this type of equipment in this manner—
regardless of the label it places on the vehicles—the com-
mands of the Acts must be obeyed. The operation as
conducted when the respondent was injured, with a motor
track car equipped with neither power nor train brakes
pulling an attached hand car with neither an automatic

---

[3] 36 Stat. 298, 45 U. S. C. § 11, provides in part:
". . . it shall be unlawful for any common carrier subject to the
provisions of this Act to haul, or permit to be hauled or used on its
line any car subject to the provisions of this Act not equipped with
appliances provided for in this Act, to wit: All cars must be equipped
with secure sill steps and efficient hand brakes . . . ."

coupler nor hand brake, was in defiance of the requirements of the Acts. See 45 U. S. C. §§ 1–8. This is not to say that these vehicles, even when used as herein described, must be equipped with devices not adaptable to their safe operation. As was said in *Southern R. Co. v. Crockett,* 234 U. S. 725 (1914):

> "We deem the true intent and meaning to be that the provisions and requirements respecting train brakes, automatic couplers, grab irons, and the height of draw-bars shall be extended to all railroad vehicles . . . so far as the respective safety devices and standards are capable of being installed upon the respective vehicles." *Id.,* at 737–738.

It is said that there is no place on the vehicles in question here for a grab iron or a handhold and that power brakes might well increase the hazards of their operation. This may be true, but if these vehicles are to be used in a manner such as here, the Commission through the promulgation of standards or regulations covering such equipment should adapt the safety requirements of the Acts to the safe use of such vehicles and thus protect employees and the public from the hazards of their operation.

It is contended that, since the Commission has for over 60 years considered maintenance-of-way vehicles not subject to the Acts, this consistent administrative interpretation is persuasive evidence that the Congress never intended to include them within its coverage. It is true that long administrative practice is entitled to weight, *Davis* v. *Manry,* 266 U. S. 401, 405 (1925), but here there has been no expressed administrative determination of the problem.[4] We believe petitioner overspeaks

---

[4] We note that in 1953 the Interstate Commerce Commission, in a proceeding to prescribe rules governing inspection of electrically operated units and multiple-unit equipment, has itself declared a

in elevating negative action to positive administrative decision. In our view the failure of the Commission to act is not a binding administrative interpretation that Congress did not intend these cars to come within the purview of the Acts. See *Shields* v. *Atlantic Coast Line R. Co.,* 350 U. S. 318, 321–322 (1956).

The fact that the Commission has not sponsored legislation rather indicates that it thought the problem too insignificant for consideration. We think the Commission expresses this view in its *amicus curiae* brief when it says "the needs are for strict enforcement of sound operating rules and regulations rather than for air brakes, automatic couplers and the other devices specified in the Safety Appliance Acts." But this is a matter of policy for the Congress to decide and it wrote into the Safety Appliance Acts that their coverage embraced "all trains, locomotives, tenders, cars, and similar vehicles." [5] This plain language could not have been more all-inclusive. This Court has construed the language of the Act in its generic sense. In *Johnson* v. *Southern Pacific Co.,* 196 U. S. 1 (1904), with reference to the meaning of the word "car," the Court said: "There is nothing to indicate that any particular kind of car was meant. Tested by context,

---

"self-propelled unit of equipment capable of moving other equipment" to be a locomotive under the Act. *Ex parte No. 179,* 297 I. C. C. 177, 192. While the proceeding did not involve motor track cars, the language of the Commission casts some light on that problem. The Commission pointed out that "The language in the act is all-inclusive, and considering its purpose . . . the words 'any locomotive' as used in section 2 must be construed as intended to encompass *all* of the *motive* equipment of any carrier subject to the act. . . . Appearance clearly cannot determine the classification into which this type of equipment should be placed." (Emphasis added.) *Id.,* at 191–192.

[5] 32 Stat. 943, 45 U. S. C. § 8.

subject matter and object, 'any car' meant all kinds of cars running on the rails, including locomotives." *Id.*, at 15–16. See also *Spokane & Inland R. Co.* v. *Campbell,* 241 U. S. 497 (1916).

While there is a paucity of cases on the point, with none to the contrary of our holding here, as early as 1934 in *Hoffman* v. *New York, N. H. & H. R. Co.*, 74 F. 2d 227, the Court of Appeals for the Second Circuit held a hand car or push truck, identical with the one here involved, and a small gasoline tractor subject to the Acts. The hand car was attached to the gasoline tractor by means of a hook (though the engine had an automatic coupler on one end) and the petitioner was injured when the hook dislodged and he was pinned between the car and the locomotive. The court unanimously held that if a hand car "is to be operated by a locomotive [which it held the gasoline tractor to be], rather than by hand, we are not inclined to depart from the literal terms of the statute and dispense with the requirement of an automatic coupler." *Id.*, at 232. Three years later the requirement of the Acts as to power or train brakes was held applicable to other than standard equipment in *United States* v. *Ft. Worth & D. C. R. Co.*, 21 F. Supp. 916. There a trial court in the Northern District of Texas held that where a locomotive crane was "used to haul cars . . . it is being used for the purposes for which a locomotive is used and is a locomotive . . . regardless of whatever else it might also be." *Id.*, at 918. In 1955 the Supreme Court of Florida unanimously held in *Martin* v. *Johnston,* 79 So. 2d 419, that the same type motor track car as is involved here came within the terms of the Acts. There the motor track car was being used entirely separately and independently from any other vehicle. The Safety Acts require all cars to be equipped with "efficient hand brakes." The failure of the brakes was the cause of

the injury. The court commented: "There being as much reason for requiring the motor-car in question to be equipped with efficient handbrakes, to insure its safe operation when propelled under its own power, as there is for the requirement that such a car be equipped with automatic couplers, where it is to be used in connection with a train movement, we have the view that the Safety Appliance Acts are applicable and that we are not authorized to depart from the literal terms of the statute." *Id.,* at 420.

Nor do we find that § 6 of the Acts exempts these vehicles from the provisions of the Acts. Though it is true that the cars are of the four-wheel variety, they are used neither in coal trains nor as logging cars. As the Commission points out in its *amicus curiae* brief, the proviso of § 6 originally exempted "trains composed of four-wheel cars or . . . locomotives used in hauling such trains," and the legislative history shows that this provision was enacted specifically to exempt coal cars. 24 Cong. Rec. 1477. This language was incorporated in the phraseology of the present section which admittedly through error was thought to apply to the exemption of trains composed of logging cars. See H. R. Rep. No. 727, 54th Cong., 1st Sess. The legislative history of the section reveals beyond doubt that it has no application here.

In view of the history and purposes of the Safety Appliance Acts, and the literal language used by the Congress that they embraced "any car" [6] and "any locomotive engine . . . hauling . . . any car," [7] together with the practical necessity of affording safety appliances to thousands of railroad maintenance employees, as well as the public, we conclude that the motor track car and hand car

---

[6] 27 Stat. 531, 45 U. S. C. § 2.

[7] 27 Stat. 532, as amended, 45 U. S. C. § 6.

when used by the petitioner in the manner employed here must be equipped in accordance with the requirements of the Safety Appliance Acts.

*Affirmed.*

MR. JUSTICE BURTON, whom MR. JUSTICE FRANK-FURTER, MR. JUSTICE HARLAN and MR. JUSTICE WHIT-TAKER join, dissenting.

In this Federal Employers' Liability Act suit, the District Court instructed the jury that the Safety Appliance Acts [1] required the railroad to equip a gasoline-driven motor track car with a train brake and a push truck with a hand brake, and that the railroad was liable if its failure to furnish this equipment contributed to the accident. The correctness of this instruction presents the issue whether the Safety Appliance Acts apply to these small maintenance-of-way vehicles—the successors to the familiar handcars of years ago. The Court approves the instruction, and, in doing so, it holds that a motor car is a "locomotive," that a push truck is a "car," and that the two combined are a "train" as those terms are used in the Safety Appliance Acts. I do not find in the language of the Acts, their background and legislative history, or in the long-standing administrative practice of the Interstate Commerce Commission justification for so holding.

On November 1, 1951, respondent Jackson, the foreman of a Baltimore & Ohio maintenance crew, was engaged with two of his men in railroad maintenance work near Washington Grove, Maryland. At quitting time, the three men lifted a motorized track car and a push truck onto the tracks, coupled them together by hand, and boarded the motor car for their return to the section house about one mile away. It had been raining lightly

---

[1] 27 Stat. 531, as amended, 29 Stat. 85, 32 Stat. 943, 36 Stat. 298, 62 Stat. 909, 45 U. S. C. §§ 1–16.

and the tracks were wet. The motor car and push truck had traveled about 195 feet when Jackson, who was operating the motor car, saw a large dog about to cross the tracks in front of the car. He threw out the clutch and applied the hand brake with both hands. The brakes grabbed, the wheels locked and the vehicles slid "about 20 feet" on the wet tracks before striking the dog and overturning. Jackson was injured.

The motor track car on which Jackson and his crew were riding was a four-wheel maintenance-of-way vehicle weighing about 800 pounds. Powered by a gasoline motor and controlled with a throttle, clutch and hand brake, it was typical of the more than 60,000 vehicles of this type currently in use on American railroads to carry maintenance crews from section houses to places along the railroad where work is to be performed. The push truck was an even simpler vehicle. It consisted of four wheels, a chassis, and a flat wooden platform, and could be pushed along the tracks by hand.

At the time of the accident, the push truck was attached to the rear of the motor car by a simple non-automatic link and pin device, and carried no load except a few tools. Jackson testified that the use of a push truck in conjunction with a motor track car was customary; that neither vehicle carried an unusual or excessive load; that each was provided with the usual equipment of such vehicles; and that the hand brake of the motor car was in proper working order at the time of the accident.

The Safety Appliance Acts make it mandatory that specified equipment be used on railroad vehicles covered by the Acts. Criminal penalties are imposed for each violation.[2] Civil liability in damages under the

---

[2] Section 6, 27 Stat. 532, 45 U. S. C. § 6; § 4, 36 Stat. 299, 45 U. S. C. § 13.

Federal Employers' Liability Act follows as a matter of course if the violation is a proximate cause of an employee's injury.[3] The vehicles subject to the Acts must be equipped with such devices as power driving-wheel brakes, appliances for operating a train-brake system, automatic couplers of a standard height, sill steps, grab irons and handholds, and hand brakes. In determining whether motor cars and push trucks must be equipped with such appliances, the language of the Acts is the proper starting point.

The Safety Appliance Acts apply expressly to "all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce . . . and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith . . . ." 32 Stat. 943, 45 U. S. C. § 8. The term "similar vehicles" shows that all vehicles are not included. Motor cars and push trucks must come within the terms "locomotives," "cars," or "similar vehicles."

The statutory context demonstrates that the crucial terms—"locomotives" and "cars"—were used in their ordinary sense as referring to standard operating equipment rather than to small maintenance-of-way vehicles like those involved in this case. For example, § 1, 27 Stat. 531, 45 U. S. C. § 1, which requires "power driving-wheel brake[s]" and a "train-brake system," speaks in terms of a "locomotive engine," "engineer," "brakemen" and "train." [4] A small motor car used to haul section

---

[3] See, e. g., Urie v. Thompson, 337 U. S. 163; Jacobson v. New York, N. H. & H. R. Co., 206 F. 2d 153.

[4] ". . . it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic . . . that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer

hands and their tools to and from work would not ordinarily be called a "locomotive engine" except in jest, nor would a motor car with a push truck attached be referred to as a "train." Much less would the section hand operating the motor car, who would ordinarily belong to a separate union—the Brotherhood of Maintenance of Way Employees—be referred to as an "engineer" or his crew as "brakemen." This is language appropriate to vehicles and employees used in standard freight and passenger operations but not to a motor car towing a push truck.

Other sections indicate that the word "car" refers to standard railroad cars. Section 2 makes it unlawful for any railroad "to haul or permit to be hauled or used on its line any car . . . not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." 27 Stat. 531, 45 U. S. C. § 2. This section, as well as the detailed provisions of § 5 dealing with the prescribed height of drawbars on couplers, could not be applicable to cars of little more than a yard's height easily coupled by hand without danger to anyone.[5]

The background and legislative history of the three Safety Appliance Acts confirm this view. Their history reveals not only that it never was suggested that the Acts were applicable to small maintenance-of-way vehicles,

---

on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." 27 Stat. 531, 45 U. S. C. § 1.

[5] The language of § 3 reinforces this conclusion. It provides that a railroad that has complied with § 1 "may lawfully refuse to receive from connecting lines of road or shippers any car not equipped sufficiently . . . with such power or train brakes as will work and readily interchange with the brakes in use on its own cars . . . ." 27 Stat. 531, 45 U. S. C. § 3. It is concerned with the transfer of standard freight or passenger cars from one railroad to another and is not applicable to maintenance-of-way vehicles.

but also that the stated objectives of the Acts would not be served by subjecting these vehicles to the Acts.

The recognized purpose of each of the Safety Appliance Acts was the protection of operating employees of railroads from the hazards involved in the movement of standard trains and cars. The first Safety Appliance Act, 27 Stat. 531, 45 U. S. C. §§ 1–7, enacted in 1893, was preceded by a decade of concern, not with light maintenance equipment, but with the death toll caused by the two major hazards facing railroad trainmen: (1) the necessity for operating employees to work between freight cars in coupling them, and (2) the necessity for brakemen to operate hand brakes while standing on the tops of freight cars.[6] The Interstate Commerce Commission, the railroad Brotherhoods, and other groups advocated legislation which would reduce these hazards by requiring uniform automatic couplers and power brakes on freight trains.[7] Congress was concerned wholly with these hazards and the Act adopted relates entirely to them.[8]

---

[6] See S. Rep. No. 1049, 52d Cong., 1st Sess. 2–3, 5; H. R. Rep. No. 1678, 52d Cong., 1st Sess. 1, 3; 1 Sharfman, The Interstate Commerce Commission (1931), 246, n. 4. Since passenger cars, by 1893, had generally been equipped with the required appliances—train brakes and automatic couplers—they did not present the same hazards to trainmen.

[7] The Commission recommended enactment of legislation in 1889 after completing a general investigation of railroad safety conditions. It continued to press for legislation until the enactment of the first Safety Appliance Act in 1893. See Interstate Commerce Commission Activities, 1887–1937 (1937), 118–120; Third Ann. Rep., I. C. C., for 1889, 44–45, 84–101; Fifth Ann. Rep., I. C. C., for 1891, 337–340; Sixth Ann. Rep., I. C. C., for 1892, 69–70.

[8] The 1893 Act was entitled "An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes." The only provision

The present significance of these specific objectives is that they do not relate to motor cars and push trucks. Unlike standard railroad cars and trains, motor cars and push trucks do not require power brakes to bring them safely to a stop, and they do not endanger the section hands who couple them by pushing them together by hand. Operated and used by maintenance workers rather than by operating employees, motor cars and push trucks move at comparatively slow speeds and present hazards quite different from those faced by trainmen on standard trains.

By 1900, the railroads were in substantial compliance with the original Act.[9]  Nevertheless, the Interstate Commerce Commission, disturbed because some locomotives and standard cars were not required to be equipped with automatic couplers, recommended broadening amendments. These recommendations called for automatic couplers for all locomotives and for "all vehicles . . . which are ordinarily hauled or propelled by standard locomotives."[10]  The second Safety Appliance Act, enacted in 1903, 32 Stat. 943, 45 U. S. C. §§ 8–10, incorporated these recommendations. It extended the first Act to "all trains, locomotives, tenders, cars, and *similar vehicles* used on any railroad engaged in interstate commerce . . . and to all other locomotives, tenders, cars, and *similar vehicles* used in connection therewith . . . ." (Emphasis supplied.) Initially, the word "vehicles" in the bill was unqualified by the word "similar." S. Rep. No. 1930, 57th

which might be thought to be unrelated to power brakes or automatic couplers was the requirement in § 4 of "secure grab irons or handholds in the ends and sides of each car" and this requirement was expressly stated to be "for greater security to men in coupling and uncoupling cars." 27 Stat. 531, 45 U. S. C. § 4.

[9] Fourteenth Ann. Rep., I. C. C., for 1900, 76.

[10] Fifteenth Ann. Rep., I. C. C., for 1901, 68; Sixteenth Ann. Rep., I. C. C., for 1902, 61.

Cong., 1st Sess. 16. However, a railroad representative objected to it on the ground that it was too broad and suggested the term "traffic cars." *Id.*, at 16–17. The legislative representative of the Brotherhoods opposed the suggested substitute because it might be thought inapplicable to "cabooses, steam shovels, snowplows, scale cars, and similar conveyances," which are used in connection with standard equipment. *Id.*, at 46. The result was that the word "vehicles" was qualified by the addition of "similar." This indicates that the term "similar vehicles" was used to cover special equipment, such as snowplows, used in connection with standard equipment. Maintenance-of-way vehicles have never been capable of such use.

The third Safety Appliance Act, 36 Stat. 298, 45 U. S. C. §§ 11–16, enacted in 1910, supplemented the existing Acts so as to require additional safety appliances, but did not extend the coverage. "Cars" were to be equipped with secure sill steps and efficient hand brakes; "cars" requiring secure ladders and running boards were to be so equipped; secure handholds or grab irons were to be installed on the roofs at the tops of such ladders; and the Commission was to designate the standards for these and certain other appliances, as well as to modify or change the standard height for drawbars. These additions grew out of recommendations made by the Commission and their history reveals an intent to secure *uniform* equipment on *operating* cars.[11] Uniformity was considered to be imperative because *trainmen* working on *trains* by day and by night would operate more safely if the appliances they needed—sill steps, ladders, running boards, grab irons and the like—were uniform in character and location on all *freight cars*. Most

---

[11] Twenty-third Ann. Rep., I. C. C., for 1909, 40–41; S. Rep. No. 250, 61st Cong., 2d Sess. 2; H. R. Rep. No. 37, 61st Cong., 2d Sess.

of these appliances are not at all adapted to motor cars and push trucks. On these small vehicles there not only is little or no need for this equipment, but there is no suitable place to attach it.

The inapplicability of the Safety Appliance Acts to maintenance-of-way vehicles is confirmed by the long-standing administrative interpretation of the Interstate Commerce Commission and by numerous practical considerations. The Interstate Commerce Commission has administered these Acts for over half a century. During that time, it has, by its own statement, "never considered the small maintenance of way vehicles subject to those acts . . . ."[12] Its order of March 13, 1911, specifying the number, dimensions and location of the appliances required by the Acts, omits all mention of motor track cars and push trucks.[13] Motor cars are not subjected to the inspection required of "locomotives." Maintenance-of-way vehicles are not considered as trains, locomotives or cars for accident reporting purposes.[14]

Despite the Commission's consistent construction of the Acts since their inceptions, the Court today states

[12] "For over half a century, the Commission has administered the Safety Appliance Acts, as well as the other acts relating to railroad safety. During this period, the Commission has never considered the small maintenance of way vehicles subject to those acts, and we submit that the foregoing contemporary and legislative histories furnish a sound foundation for its view. That legislation is concerned with locomotives, cars and similar vehicles which employees were formerly required to go between to couple, or to ascend to use the hand brake. The acts are designed primarily to reduce or eliminate those hazards. They should not be construed to apply to entirely different types of equipment whose operation does not involve such risks." Brief of Interstate Commerce Commission, as *amicus curiae*, 18–20.

[13] This order was amended in 1943 and republished in 1946. 49 CFR, 1949, Pt. 131.

[14] See I. C. C., Accident Bulletin No. 124 for 1955, 94.

that "there has been no expressed administrative determination . . . ." *Ante*, p. 330. Not only was there no reason for the Commission to disclaim application, but its "negative" action in declining to subject these vehicles to the Acts is impressive because the Acts impose an affirmative duty on the Commission to enforce their provisions.[15] The Commission and the Department of Justice have been aware that motor cars and push trucks used by American railroads were not equipped with automatic couplers, power brakes and so on. Their failure to prosecute evidences their interpretation of the Acts. *Federal Trade Commission* v. *Bunte Brothers, Inc.*, 312 U. S. 349, 351–352.

The contemporaneous and long-standing interpretation of any regulatory Act by the agency that administers it is entitled to great weight.[16] Here there are considerations entitling the Interstate Commerce Commission's views to special respect. See *Davis* v. *Manry*, 266 U. S. 401, 404–405. The Commission has played a predominant role in developing and perfecting the Acts, and Congress has given it broad discretionary powers in administering them. Its consistent interpretation of the Acts, known to Congress, the railroad industry and the railroad labor organizations, is persuasive evidence that the Acts never were intended to apply to motor cars and push trucks.[17]

---

[15] Under § 6 of the original Safety Appliance Act, 27 Stat. 532, 45 U. S. C. § 6, and §§ 5 and 6 of the third Safety Appliance Act, 36 Stat. 299, 45 U. S. C. §§ 14 and 15, the Interstate Commerce Commission has the mandatory duty of informing United States District Attorneys of violations of the Acts; these attorneys have the mandatory duty to prosecute violators; and railroads are liable for a penalty of $100 for each violation.

[16] See, *e. g.*, *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 311–315; *Wisconsin* v. *Illinois*, 278 U. S. 367, 413.

[17] The two federal court decisions relied on by the Court are distinguishable. The 18-foot gasoline tractor which was held to be

It is also significant that the Brotherhood of Mainte-
nance of Way Employes, whose members operate and
maintain motor cars in their work, never has contended
that the Safety Appliance Acts apply to these vehicles.
However, the Brotherhood has been active in soliciting
other legislation which it feels will add to the safety
of its members.[18]   It has sought legislation from Congress
which would require strict enforcement of sound operat-
ing rules and regulations.   Although supported by the
Commission, these attempts thus far have failed.[19]   The
Brotherhood, however, has secured other safety legislation.
Largely at its request, 26 States, in recent years, have
adopted legislation requiring specific equipment, such as
headlights, taillights, windshields, windshield wipers and
canopies, on motor track cars.[20]   This state legislation
dealing expressly with the safety requirements of motor

---

a "locomotive" in *Hoffman* v. *New York, N. H. & H. R. Co.*, 74 F.
2d 227, was equipped with an automatic coupler, was used to haul
standard railroad cars and was capable of hauling 22 freight cars
loaded with cement.   Such a vehicle bears little resemblance to the
motor track car involved here.   *United States* v. *Fort Worth &
D. C. R. Co.*, 21 F. Supp. 916, is even less in point.   In that case
it was held that a large Browning steam locomotive crane, engaged
in hauling standard railroad cars, was a "locomotive" and the com-
bination of cars a "train" within the meaning of the Acts.   The Florida
decision, *Martin* v. *Johnston*, 79 So. 2d 419, lends little support
because the state court appears to have been unadvised of the above-
stated purpose, legislative history, and administrative interpretation
of the Acts.

[18] Hertel, History of the Brotherhood of Maintenance of Way
Employes (1955), 212–213.

[19] See H. R. Rep. No. 1558, 81st Cong., 2d Sess. 3–4; Hearings
before House Subcommittee on Interstate and Foreign Commerce
on H. R. 378 and H. R. 530, 81st Cong., 1st Sess. 17–54.

[20] Hertel, *op. cit. supra*, 213.   See, *e. g.*, Mass. Acts 1952, c. 430,
and 1951, c. 174; Mich. Stat. Ann., 1955 Cum. Supp., §§ 22.965,
22.966, 22.968 (1)(2).

track cars indicates that the Federal Acts have not been thought to apply to them. As to the question of preemption, see *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605, 611.

Practical considerations, relating to the safety of railroad maintenance workers who use motor cars and push trucks, support the inapplicability of the Acts. The major hazard in the use of these vehicles is the risk of their collision with trains. It is important that maintenance-of-way vehicles be so light that three or four men can lift them quickly off the tracks. In contrast, most of the safety appliances required by the Acts have little or no relation to this or other safety requirements of these small vehicles. Whether it is feasible to equip them with power brakes, automatic couplers, and the other appliances specified in the Acts is highly conjectural. Motor cars and push trucks might, in fact, be rendered less safe by the addition of such appliances, not only because of the increased weight but because of the danger of sudden stops. A railroad brake expert in this case spoke of the danger of men being thrown from their open seats on a motor car by quick stops, and the Commission, in its *amicus* brief, states that "In the absence of tests showing otherwise, it would seem that power brakes on push trucks towed by a track motor car could well be about as dangerous a device to employees riding on such vehicles as one can imagine." P. 20. According to the Commission, protection against collision with trains is better assured by strict enforcement of rules designed to give warning of train movements than by the addition of the safety appliances named in the Acts. In any event, such matters are peculiarly within its competence.

The Court's decision is directly opposed to the Commission's practice and opinion. It imposes onerous requirements, unrelated to safety, on a large class of

vehicles never before considered subject to the Acts.[21] Nothing in the language of the Acts or in their history compels a disregard of the informed judgment of that expert authority which has the responsibility of their administration and enforcement.

I would sustain the view of the Interstate Commerce Commission and reverse the judgment of the Court of Appeals.

---

[21] The Court also rejects the railroad's alternative contention that motor track cars and push trucks, if within the purview of the Acts, are excepted from the Acts by virtue of the proviso in § 6 exempting "trains composed of four-wheel cars or . . . locomotives used in hauling such trains." 27 Stat. 532, 29 Stat. 85, 45 U. S. C. § 6. This proviso confirms the view expressed in this dissent that power brakes, automatic couplers, and the other specified appliances are not required of motor track cars and push trucks. The exception, on its face, applies to them as four-wheel vehicles. And, although the legislative history indicates that Congress had four-wheel coal cars primarily in mind, the proviso is not expressly limited to coal cars and is thoroughly consistent with a purpose to exempt from the Acts maintenance vehicles that are not suited to the prescribed safety appliances.