The issues here arise out of a Federal Employers' Liability Act ("FELA") case. One of the primary issues is whether the trial court erred in dismissing the third-party complaint filed by the railroad against the plaintiff's co-employee on the ground that the FELA did not permit the railroad to maintain such a third-party suit against a co-employee of the injured party.
The other issues arise out of the trial of the plaintiff's FELA action against the railroad, and are as follows: 1) whether the trial court erred in excluding evidence offered by the railroad that the plaintiff was receiving Railroad Retirement Board benefits; 2) whether the trial court erred in instructing the jury that the railroad "burro crane" involved in the collision was a "locomotive," within the meaning of the FELA; 3) whether the trial court erred in admitting into evidence a prior consistent statement made by the plaintiff before the accident regarding the failure of the brakes on the burro crane, to rehabilitate the plaintiff, who had been impeached; and 4) whether the trial court erred in failing to define the term "proximate cause" in the instructions given to the jury.
The plaintiff, Archie R. Haynes, having been injured in a job-related accident, filed a FELA suit against Illinois Central Gulf Railroad in the Circuit Court for Jefferson County, in which he alleged that the railroad had been negligent and had failed to provide a reasonably safe place for him to work and that the railroad's negligence and failure had caused his injuries. He further alleged that his injuries were caused by a defect in the braking apparatus of the burro crane that he was operating at the time *Page 538 
of the collision. The defect was alleged to be in violation of the Locomotive Inspection Act and the Train Brake Act.
The railroad filed a third-party complaint against Bobby Lessel, a co-employee of the plaintiff, who was the pilot of the burro crane at the time of the collision. Lessel had also filed a FELA action against the railroad arising out of the same operative facts. On motion of the railroad, Lessel's lawsuit was consolidated with the plaintiff's, but Lessel's case was settled before trial. The trial court dismissed the railroad's third-party complaint against Lessel.
The plaintiff's action was tried before a jury, and the jury awarded him $420,000.00. The railroad filed a motion for a new trial, stating several grounds, including the ones presented here.
Several of the basic operative facts are not seriously disputed. On June 16, 1987, the plaintiff, Archie Haynes, a burro crane operator for the railroad, and Bobby Lessel, a burro crane pilot, were injured when the burro crane in which they were riding collided with a train. The plaintiff's first assignment on that day was to use the burro crane to switch cars and make up a train for his bridge supervisor. Subsequently, Haynes and Lessel backed up the burro crane with a tool car behind it and proceeded to "A" yard. Haynes operated the crane by standing and looking out the door of the crane. As he went around a curve he saw a train on the tracks ahead. Haynes claims that he applied the brakes but that he did not hear any air and that the brakes did not work. Fearful that a collision was imminent, Haynes jumped from the crane and fell against the cars on the adjacent track. Unaware of the impending danger, Lessel was still on the crane and was thrown on impact. Both Haynes and Lessel were injured.
 The Dismissal of the Third-Party Complaint
In its third-party complaint, the railroad demanded a judgment against Lessel, "based on the principles of common law indemnity," "for all sums of money which [the railroad] may be adjudged to pay to plaintiff by reason [of] the injuries alleged in his complaint." In dismissing the third-party complaint, the court found that §§ 5 and 10 (45 U.S.C. § 55 and § 60) of the FELA prohibited the railroad from filing a third-party complaint against the plaintiff's co-worker.
We agree that the trial court did not err in dismissing the railroad's third-party claim, because it affirmatively appears from the face of the complaint that the railroad was seeking indemnity from Lessel for any sum it might be required to pay as a result of Lessel's alleged negligent act. In finding that the trial court did not err in dismissing the third-party complaint, we do not address the question of whether a railroad, in a proper case, could maintain a counterclaim or third-party claim to recover for property damage allegedly resulting from a plaintiff's or a third-party's negligence, and arising out of the same basic operative facts. See, Murphy,Sidetracking the FELA: The Railroads' Property Damages Claims, 69 Minn.L.Rev. 349 (1985), in which the author collects the federal and state cases that have addressed the question, and in which he concludes that "[i]f courts continue to thwart Congress's overriding remedial objective by permitting such liability-avoidance techniques as the recently invented property damage counterclaim, Congress once again should intervene to clarify the situation by explicitly barring such actions." 69 Minn. L.Rev. at 394.
Because the third-party claim in this case arose out of the same operative facts giving rise to the plaintiff's FELA claim, and because the railroad was seeking indemnity for any sums it might be required to pay to the plaintiff for his personal injuries, we must construe the provisions of the Act, considering the railroad's argument that the provisions of the Act do not forbid its third-party complaint.
Section 5 of the FELA states in pertinent part:
 "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability *Page 539 
created by this chapter, shall to that extent be void."
55 U.S.C. § 55.
Section 10 of the FELA states in pertinent part:
 "Any contract, rule, regulation, or device whatsoever, the purpose, intent or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void[.]"
55 U.S.C. § 60.
There is some disagreement among federal and state jurisdictions as to whether a defendant railroad in a FELA action may maintain a property damage claim. The railroad points out that this court is not the first court asked to decide whether § 5 of the FELA bars claims like that asserted by the railroad in this case, stating in its brief the following:
 "The majority of courts have permitted such claims against railroad employees by their employer railroads. See, e.g., Sprague v. Boston and Maine Corp., 769 F.2d 26 (1st Cir. 1985); Cavanaugh v. Western Maryland R.R., 729 F.2d 289
(4th Cir. 1984); C.H.B. Foods v. Rebelo,662 F. Supp. 1359 (S.D.Cal. 1987); Capitola v. Minneapolis, St. Paul and Sault Ste. Marie R.R., 258 Minn. 206, 103 N.W.2d 867 (1960); Kentucky Indiana Terminal R.R. v. Martin, 437 S.W.2d 944
(Ky. 1969); Cook v. St. Louis-San Francisco R.R., 75 F.R.D. 619 (W.D.Okla. 1976); Key v. Kentucky Indiana Terminal R.R., No. C 78-0313-L(a) (W.D.Ky. 1979); and Consolidated Rail Corp. v. Dobin, No. 82-2539 (E.D.Pa. 1981).
 "The minority view is that such claims are not permitted. See Stack v. Chicago, Milwaukee, St. Paul Pacific Railroad, [94 Wn.2d 155] 615 P.2d 457 (Wash. 1980); Sheilds v. Consolidated Rail Corp., 530 F. Supp. 400 (S.D.N.Y. 1981)."
We are unable to agree with the railroad's argument that the FELA does not prohibit the filing of a third-party claim such as the one dismissed by the trial judge here. We believe that the Congress, in adopting §§ 5 and 10 of the FELA, intended to prohibit the filing of a common law indemnity claim such as the one filed here. We are further of the opinion that the cases cited by the railroad in support of its argument are distinguishable in that they deal with counterclaims forproperty damage and do not address the specific indemnification claim presented here.
The railroad has not cited to us a case in which a state or federal court has held that a third-party claim such as the one filed here has been permitted, and there is disagreement among the jurisdictions as to whether a counterclaim for property damage is allowed. An outline of the two views of property damage counterclaims is set out in Cavanaugh v. WesternMaryland R.R., 729 F.2d 289 (4th Cir. 1984) and Stack v.Chicago, Milwaukee, St. Paul Pacific R.R., 94 Wn.2d 155,615 P.2d 457 (Wash. 1980).[1]
In Cavanaugh, the Court of Appeals for the Fourth Circuit reversed the trial court's order dismissing a counterclaim filed by the railroad against the plaintiff employee. There, the plaintiff served as engineer on a Baltimore and Ohio Railroad Company ("B O") train that collided with another B 
0 train. Cavanaugh initiated a FELA action in the United States District Court, seeking a recovery for personal injuries sustained in the collision. In response, the railroad filed a counterclaim to recover for property damage resulting from the same collision. The trial court dismissed the counterclaim, based on a holding that the claim violated §§ 5 and 10 of the FELA. The Fourth Circuit disagreed.
In the Cavanaugh opinion, the Fourth Circuit noted that the applicable state law, that of West Virginia, allowed the employer a common law cause of action against an employee for any property damage resulting from negligent acts that the employee *Page 540 
committed within the scope of his employment.Cavanaugh, 729 F.2d at 290-91. The court also noted that the railroad's claim arose out of the same transaction or occurrence that gave rise to the plaintiff's cause of action and thus was a compulsory counterclaim under F.R.Civ.P. 13(a), and that the railroad's failure to assert it would result in a waiver of the claim. Id. at 291. The Fourth Circuit concluded that the railroad was entitled to assert its common law claim unless it was precluded by the FELA. Id.
In order to determine if the FELA did indeed preclude this common law claim, the court looked at the language of §§ 5 and 10, the legislative history of the FELA, and relevant case law. See Note, The FELA and an Employer's Right to Sue: PropertyDamages Resulting from Employee Negligence, 42 Wn. Lee L.Rev. 708, 712 (1985). The court found no "explicit language in the Act which could be said to require, or even suggest" that the railroads must give up their common law right to hold an employee liable for property damage occasioned as a result of the employee's negligence. Cavanaugh, 729 F.2d at 291.
The plaintiff in Cavanaugh, like the plaintiff in the case at bar, argued that a counterclaim was a "device," under § 5, used by the railroad to exempt itself from liability to the plaintiff employee. The court disagreed with the employee's argument and found that the critical word in the definition of "device" was "exemption":
 "It is only when the 'contract . . . or device' qualifies as an 'exempt[ion] itself from any liability' that it is 'void[ed]' under Section 5. But a counterclaim by the railroad for its own damages is plainly not an 'exempt[ion] . . . from any liability' and is thus not a 'device' within the contemplation of Congress."
Id. at 292.
The court looked at the legislative history of § 5 to determine the definition of the term "device," id., and concluded that the legislative history showed that the Congress was trying to eliminate employment contracts that release the company from liability for damages arising out of the negligence of other employees or of the common carrier. Id. As a result, the court held that a counterclaim by the railroad was not a " 'contract . . . or device' the purpose of which [was] to provide an exemption which Congress was intending to 'void' in Section 5." Id.
Our reading of Cavanaugh and some of the legislative history of the FELA convinces us that Congress intended to make employers responsible for the acts of their employees.[2] To permit an employer to seek indemnification, however, would violate the intent of Congress rather than foster it. We, therefore, affirm the judgment of the trial court dismissing the third-party claim.
 The Exclusion of Evidence Concerning Haynes's Receipt of Railroad Retirement Benefits
The railroad sought to introduce evidence through cross-examination of *Page 541 
Haynes concerning his receipt of Railroad Retirement Board disability and sickness benefits after Haynes testified that he had insufficient financial resources to attend a trade or vocational school. Haynes testified that he was unable to return to work because of the extent of his injuries and that he could not afford to go to school. The trial court excluded any questions concerning the receipt of railroad disability and sickness benefits, based on the collateral source rule. The railroad contends that Haynes's receipt of these disability and sickness benefits should have been presented to and considered by the jury.
The railroad asks this Court to abandon the collateral source rule as applied to Railroad Retirement Board disability benefits. The railroad argues many reasons why this rule is "dated," and why we should carve out an exception to the collateral source rule in this case. We cannot agree with the argument, as this Court abides by the holding of the United States Supreme Court in Eichel v. New York Cent. R.R.,375 U.S. 253, 254, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963).
In Eichel, the Supreme Court held that evidence of disability payments was not admissible "for the purpose of impeaching the testimony of petitioner as to his motive for not returning to work and as to the permanency of his injuries." Eichel,375 U.S. at 254-55, 84 S.Ct. at 317. The Court stated: " '[T]he benefits received under [the Railroad Retirement Act] are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer.' " Id. at 254, 84 S.Ct. at 317, citing NewYork, N.H. H.R.R. v. Leary, 204 F.2d 461, 468, (1st Cir.) cert. denied, 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 370 (1953).
Our case law shows that this Court has strictly adhered to the collateral source rule and that under the rule any showing that the plaintiff received payments from a source wholly independent of the wrongdoer, such as workmen's compensation or disability payments, constitutes reversible error.[3] See Jones v.Crawford, 361 So.2d 518 (Ala. 1978); Gribble v. Cox,349 So.2d 1141, 1143 (Ala. 1977) (this Court is "committed to the rule of exclusion of collateral source payments"); Vest v. Gay,275 Ala. 286, 154 So.2d 297 (1963); see also Southern v. PlumbTools, A Division of O'Ames Corp., 696 F.2d 1321 (11th Cir. 1983).
The Eichel rationale was recognized by this Court in Jones v.Crawford, 361 So.2d 518, 521 (Ala. 1978), when the Court stated that "courts have held that any showing that the plaintiff has received insurance benefits for his injuries is prejudicial to his case and should not be admitted." (Emphasis added.) The reason underlying the exclusion of evidence regarding collateral source payments is that, based upon a weighing of the prejudice it causes to the plaintiff against its value to the defendant, its exclusion is warranted by the availability of less prejudicial evidence on the issue. See Gribble, 349 So.2d at 1143. We refuse to change the collateral source rule in Alabama in FELA actions.
The railroad further argues that even if the collateral source rule applies, the evidence of the disability and sickness payments should be introduced, because, it says, Haynes opened the door to that evidence when he testified on direct examination that he did not have the money to go to school. The railroad cites Lange v. Missouri Pacific R.R.,703 F.2d 322 (8th Cir. 1983), and Gladden v. P. Henderson Co.,385 F.2d 480 (3rd Cir. 1967), to support this proposition. InLange, the plaintiff testified that he had to return to work immediately after undergoing surgery for a back injury because he had to support his family and had no savings or disability income to fall back upon. The Court of Appeals for the Eighth Circuit allowed the defendant to introduce evidence that the plaintiff did indeed receive disability payments, because *Page 542 
under the applicable Arkansas law, such payments are relevant when the plaintiff's direct testimony is misleading concerning some issue in the case and cross-examination is necessary to rebut the testimony. Lange, 703 F.2d at 324.
In Gladden, the plaintiff testified, on direct examination, that he returned to work and did not revisit his physician because of strained financial circumstances. The Court of Appeals for the Eleventh Circuit allowed the defendant to introduce evidence of collateral source payments, focusing on the fact that the defendant did not ask the plaintiff about workman's compensation benefits, but instead asked only if he had received any "financial assistance." The court stated that the "[d]efendant was not required to leave [the plaintiff's] testimony unchallenged and had the right to ask plaintiff on cross-examination whether he had received financial assistance, as affecting the credibility of his assertion." Gladden, 385 F.2d at 483.
Alabama does not allow the introduction of collateral source payments for any reason other than those laid out by the legislature in Ala. Code 1975, § 6-5-522 and § 6-5-545, dealing with product liability and medical malpractice cases. Furthermore, we find that Haynes did not refer to any collateral source payments on direct examination. He merely stated that he could not afford to go to school.
The railroad additionally argues that the railroad disability benefits attributable to Illinois Central's contributions should be deducted from the plaintiff's damages.[4] Section 5 of the FELA, 45 U.S.C. § 55, renders void any contract, rule, regulation or device "whose purpose or intent" is to enable a railroad to "exempt itself from any liability" created by the FELA. Notwithstanding this general proposition, a railroad may set off in any FELA suit "any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee . . . on account of the injury or death for which said action was brought." 45 U.S.C. § 55.
A similar issue was decided by the United States District Court for the District of New Jersey in Hetrick v. Reading Co.,39 F. Supp. 22 (D.N.J. 1941), and the district court's holding was recognized by the United States Supreme Court in a footnote in Hisquierdo v. Hisquierdo, 439 U.S. 572, 99 S.Ct. 802,59 L.Ed.2d 1 (1978).[5] We adopt the reasoning of the district court in Hetrick. In that case, the defendant in his answer asked the court to offset any damages the plaintiff might receive under45 U.S.C. § 51 by deducting the present value of payments that would be received under the Railroad Retirement Act of 1937. 45 U.S.C. § 228b (amended to § 228a et seq.). The court denied the defendant's request, after examining the legislative intent and considering the wording within the "four corners" of the Retirement Act. Hetrick, 39 F. Supp. at 25.
The district court in Hetrick noted that the right to receive benefits under the Railroad Retirement Act was an inherent right of the employee that "becomes crystallized upon the occurrence of the designated prerequisites." Id. The defendant in Hetrick, like the railroad in this case, argued that the FELA and the Railroad Retirement Act should be viewed together, on the ground that the receipt of damages for injuries under the FELA, as well as payments under the Railroad Retirement Act, were "in effect a dual recovery based on the same injuries." Id.
 "However, the [Railroad Retirement] fund is created by equal contributions from the employee and employer. For that reason it cannot be said that the defendant will be paying twice . . . for the same injury. Furthermore, we do not think that an annuity based upon total and permanent disability, etc., was ever intended as compensation, because the right to the fund does not depend *Page 543 
upon the ordinary rules of evidence. In short, the occurrence of the disability in such a case is simply the event upon which the right to the annuity accrues."
Hetrick, 39 F. Supp. at 25.
Furthermore, the defendant in Hetrick, as well as the defendant in this case, wished to offset any sum it "contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee . . . on account of the injury . . . for which said action was brought." Id. In Hetrick, the plaintiff had not yet received any payments from the Railroad Retirement Fund, whereas, in the present case the defendant has received such payments. However, the district court found this point irrelevant, saying it was the court's "understanding that Congress by the passage of the Retirement Act undertook to create a certain amount of economic security for employees of a railroad who engage in a work fraught with daily exposure to the hazard of injury, but peculiarly essential to the public." Id.
The district court denied the offset, noting:
 "The objects of the two pieces of legislation are entirely foreign to each other, and we are of the view that there never was a legislative intent that a jury . . . was to draw into its calculations the annuities provided for by the Retirement Act so that payments made by the employer under the latter legislation would be returned to it. . . . [W]e do not feel that the annuity was ever intended to restore injured employees to a theoretical status quo, but on the contrary was intended to make secure in society those employees suffering injury after thirty years of service, or perhaps because of thirty years of service. Recovery under [the FELA] is beside the point, because that is an attempted restorative alone."
Id. Because this Court adopts the reasoning of the District Court for the District of New Jersey, we deny the railroad the right to offset payments from the Railroad Retirement Board against any damages owed by the defendant.
 The Instruction that the Burro Crane is a "Locomotive"
Haynes claimed that the railroad violated the Locomotive Inspection Act, 45 U.S.C. § 23, which reads:
 "It shall be unlawful for any railroad to permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such railroad without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 22 to 29 and 31 to 34 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."
In order for the railroad to be held liable for any injury sustained by Haynes as a result of a violation of this statute, the equipment used must be a "locomotive." The trial court held that the burro crane involved in the accident was a locomotive, as a matter of law. The railroad argues that this was a question for the jury. We agree with the trial court that, as a matter of law, the burro crane in this case was being used as a "locomotive."
In Garcia v. Burlington Northern R.R., 818 F.2d 713 (10th Cir. 1987), the Court of Appeals for the Tenth Circuit held that while all railroad vehicles are not "locomotives," a vehicle is a locomotive if it is used as a locomotive. Id. at 715. While a vehicle is being used as a locomotive, it is considered a locomotive, regardless of what other use might be made of the vehicle. United States v. Fort Worth Denver CityR.R., 21 F. Supp. 916, 918 (N.D.Tex. 1937).
In Baltimore Ohio Ry. v. Jackson, 353 U.S. 325, 329,77 S.Ct. 842, 845, 1 L.Ed.2d 862 (1957), the Supreme Court upheld the judgment of the court of appeals by finding that the vehicle involved in that case was a locomotive, stating: *Page 544 
 "We believe that the controlling factor is the nature of the employment of the vehicles in the railroad's service, that is the type of operation for which they are being used. . . . In light of the prime purpose of the Safety Appliance Acts, i.e., 'the protection of employees and others by requiring the use of safe equipment,' Lilly v. Grand Trunk Western R. Co., 317 U.S. 481, 486
[63 S.Ct. 347, 351, 87 L.Ed. 411] (1943), when the railroad uses this type of equipment [by pulling a hand car] — regardless of the label it places on the vehicles — the commands of the Acts must be obeyed."
Furthermore, the Court recognized Congressional intent behind the Safety Appliance Acts and stated: "[T]his is a matter of policy for the Congress to decide and it wrote into the Safety Appliance Acts that their coverage embrace 'all trains, locomotives, tenders, cars, and similar vehicles.' This plain language could not have been more all-inclusive." Baltimore Ohio Ry., 353 U.S. at 331, 77 S.Ct. at 846.
The Court of Appeals for the Tenth Circuit, inGarcia, looked at cases from various jurisdictions to determine the criteria for labeling a piece of equipment as a "locomotive." The court determined that a study of the cases revealed two requirements: "first, the vehicle must operate on railroad tracks; and second, it must perform a locomotive function." Garcia, 818 F.2d at 715. "Numerous courts have held that vehicles that push or pull railroad cars along railroad tracks are locomotives," id., and that this is true even when the pushing and pulling is only inside the railroad's yard. Id.
See Atchison, T. S.F. R.R. v. United States, 403 F.2d 211
(10th Cir. 1968). The Tenth Circuit in Garcia found that the vehicle in that case, an Electronic Tamper, was not a locomotive since it only pushed and pulled when it was "performing its own particular functions" at the worksite.Garcia, 818 F.2d at 716. Unlike an Electronic Tamper, a burro crane does not have a particular function of its own, as it usually pushes a cart which is not part of its design.
In Atchison T. S.F., the Court of Appeals of the Tenth Circuit held that a self-propelled burro crane, like the one in the case at bar, which was used to push or pull cars, was being operated as a locomotive. 403 F.2d at 212. In that case, as in the present case, the cars carried materials to be used in conjunction with the crane.
Here the burro crane was pushing a tool cart containing tools for use at work. The burro crane performed such functions as switching cars, making up trains from cars scattered on several different tracks, and transposing, laying, and hauling rail. The burro crane runs on the tracks and pushes and pulls a tool car and, therefore, meets the criteria for being considered a locomotive, as a matter of law.
 Haynes's Prior Consistent Statement
At trial, Haynes testified that the brakes of the burro crane failed, thereby causing the collision. The railroad impeached his testimony by using an accident report in which Haynes had stated that the cause of the accident was: "fail[ed] to see [the] cut of cars on the main line counter." He also stated in the accident report that there were no defects in the equipment.
On redirect examination, Haynes explained why he had stated in the accident report that there was not a problem with the brakes. He claimed that an official at the railroad had told him that if he said the brakes were defective he would lose his job. On redirect examination, Haynes also introduced a claims agent's report on the accident in which Haynes had stated that the brakes on the burro crane were not working properly. The railroad objected, claiming that Haynes was using the report to rehabilitate himself with a prior consistent statement.
We hold that on redirect examination it was proper for Haynes to explain why he had previously made a statement contradicting his present testimony. C. Gamble, McElroy's Alabama Evidence, § 159.03(1) (1991), citing Johnson v. State, 49 Ala. App. 356,272 So.2d 282 (1972) and Hairrell v. State, 16 Ala. App. 110,75 So. 702 (1917). "The extent to which the impeached witness may go into the reasons why he made the prior inconsistent statement is largely *Page 545 
within the sound discretion of the trial court." Wright v.State, 420 So.2d 823, 826 (Ala.Crim.App. 1982), citing C. Gamble, McElroy's Alabama Evidence, § 159.03(1) (3d ed. 1977). However, rehabilitation of a witness by evidence of a prior consistent statement has been held to be improper. See Long v.Whit, 197 Ala. 271, 72 So. 529 (1916); C. Gamble, McElroy'sAlabama Evidence, § 177.01(2) (1991). Professor Gamble summarizes the rule this way:
 "As a general rule, the impeachment of a witness by the introduction of evidence that he has made a statement which is inconsistent with his testimony does not authorize the proponent of the witness to support his credibility by evidence that the witness has made a statement on another occasion of the same tenor as his present testimony. This is true whether or not the witness is a party, whether or not the witness admitted the making of the prior inconsistent statement, whether the witness denied making such statement and testimony that he made it came from the mouth of another witness and whether or not the prior similar statement was made before or after the time of the claimed inconsistent statement."
C. Gamble, McElroy's Alabama Evidence, § 177.01(2) (1991) (citations omitted).
Haynes has properly stated the rule in his brief:
 "The plaintiff could testify about his fear of losing his job, engendered by a supervisor's remarks. Starr v. Starr, 293 Ala. 204, 210 [301] So.2d 78 (1974).
 "Once this evidence of coercion and duress was before the court, the court widened the scope of inquiry very properly and allowed into evidence the transcript of a statement about the same subject matter and made the same day. The propriety of the court's action is hornbook law:
 " 'Whenever issues of duress, undue influence, fraud, and good faith are raised, the evidence must take a rather wide range and may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions . . . and in all such cases, great latitude of proof is allowed and every fact or circumstance, from which a legal inference of the fact in issue may be drawn, is competent.'
29 Am.Jur. Evidence § 358 (1967).
 " 'When one's state of mind . . . in doing or omitting to do certain acts becomes an issue in a civil action, his acts, statements, and conduct on other occasions which have a bearing on his state of mind upon the occasion in question are relevant and competent evidence.'
 29 Am.Jur. Evidence § 365. See State ex rel. Attorney General v. Hasty, 184 Ala. 121, 126, 63 So. 559 (1913).
". . . .
 "It is axiomatic that rulings as to the admissibility of evidence rest largely within the discretion of the trial court and will not be disturbed on appeal unless the trial judge is guilty of 'gross' abuse of discretion. Russellville Flower Craft v. Searcy, 452 So.2d 478
(Ala. 1984), Dorcal, Inc. v. Xerox, 398 So.2d 665
(Ala. 1987 [1981])."
Even assuming that the admission of the prior consistent statement was error, we hold that it was not prejudicial. Rule 45, Ala.R.App.P.
 Jury Instructions Defining Proximate Cause
The railroad claims that the trial judge used the term "proximate cause" continuously, but did not define it. The trial judge instructed the jury:
 "Such violation or negligence must be the proximate cause, in whole or in part, of the injuries or damages claimed . . . [T]he injury or damages must be caused, in whole or in part, as a result of or as a direct result of violations or negligence [complained of]."
(Emphasis added.)
In a FELA case, the jury should be instructed that "if the alleged injury to the plaintiff . . . resulted 'in whole or in part' from defendant's negligence" the plaintiff *Page 546 
has a right to recover from the defendant. Salotti v. SeaboardCoast Line R.R., 293 Ala. 1, 299 So.2d 695, 708 (1974). This instruction concerning proximate cause is different from the classic common law definition in a common law tort case, and its use in FELA cases, appears to have arisen in the United States Supreme Court's case of Rogers v. Missouri Pacific R.R.,352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).
In Rogers, the Court did not consider how juries should be instructed; it only considered when a FELA case should be submitted to the jury, but the Court held that in a FELA action "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the [employee's injury]." Rogers, 352 U.S. at 506, 77 S.Ct. at 448. SeeSalotti, 293 Ala. at 9, 299 So.2d at 701.
In Salotti, this Court held that the rule of Rogers must be given to the jury in the jury instruction defining proximate cause in a FELA action. The trial judge in Salotti gave several instructions using the rule of Rogers and several instructions using the classic common law definition of proximate cause. This Court found that "[r]epeated instructions correctly stating the rule of the Rogers case may render harmless the error in giving a common law proximate cause instruction."Salotti, 293 Ala. at 16, 299 So.2d at 708. Therefore, in the case at bar, the trial judge correctly did not use the common law definition of proximate cause and properly instructed the jury, based on the rule of Rogers, that the plaintiff's injury must be caused, in whole or in part, by the defendant's negligence.
We find no prejudicial error here. Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] A majority of the federal district courts, when faced with a question of the propriety of a property damage counterclaim, seems to follow the Cavanaugh opinion of the Fourth Circuit.
[2] "As it is now, where the doctrine of fellow-servant is enforced, no one is responsible for the injury or death of an employee if caused by the carelessness of a coemployee. The coservant, who is guilty of negligence resulting in the injury, may be liable, but as a result [of the fellow-servant doctrine] he is not [held] responsible, and hence the injury is not compensated. The employee is not held by the employer to such strict rules of caution for the safety of his coemployee, because the employer is not bound to pay the damages in case of injury. If he were liable for damages for every injury occasioned by the negligence of his servant he would impose the same strict rules for the safety of his employees as he does for the safety of passengers and strangers . . . ."
42 Cong.Rec. 4426, 4435 (1908). The Committee also expressed the opinion that the FELA would make it incumbent upon the railroad to use a high degree of care in choosing its employees.
 "He [the master] exercises the authority of choosing the employees, and if made responsible for their acts while in the line of duty he will be induced to exercise the highest degree of care in selecting competent and careful persons and will feel bound at all times to exercise over employees an authority and influence which will compel the highest degree of care on their part for the safety of each other and the performance of their duties."
Id.
[3] Alabama has statutorily altered the collateral source rule in product liability cases and medical malpractice cases by providing that in such cases, where damages are claimed for medical expenses, evidence that such expenses have been paid is admissible. Ala. Code 1975, §§ 6-5-522 and 6-5-545.
[4] The sickness benefits were deducted from the judgment.
[5] The Supreme Court noted that a defendant employer could not offset a tort claim by the amount the plaintiff expected to receive in Railroad Retirement Act disability benefits.Hisquierdo v. Hisquierdo, 439 U.S. 572, 588-89 n. 22,99 S.Ct. 802, 812 n. 22, 59 L.Ed.2d 1 (1978).