WILLIAM J. SCOTT, Attorney General; SAUL R. WEXLER, Assistant Attorney General, for Respondent.

PER CURIAM.

(No. 5311—)

INDIANA HARBOR BELT RAILROAD COMPANY, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed August 5, 1974.*

RICHARD O. OLSON and JAMES L. DAUBACH, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; BRUCE J. FINNE, Assistant Attorney General, for Respondent.

BURKS, J.

Claimant in this action seeks reimbursement or indemnification from the respondent in the sum of $14,000 which claimant paid to one of its own employees in settlement of a suit against the claimant for personal injuries suffered by its employee. Claimant contends that its employee's injuries were primarily caused by respondent's negligence, and that claimant was guilty only of passive technical negligence in connection with its employee's injuries.

Claimant seeks reimbursement from the State under the doctrine of common law indemnity which is recognized by our courts as a law of this State. Hence, our jurisdiction of the subject matter stems from §8(a) of the *Court of Claims Act.*

Bearing in mind that the employee who suffered personal physical injuries is not a party to this action, we will hereafter, for the sake of clarity, frequently refer to claimant as "the Railroad" and to the respondent as "the State".

The Railroad maintains a large yard in Blue Island, in the vicinity of 13800 South Halsted Street. At that location, the State owns and maintains an overpass bridge which serves to carry Halsted Street traffic over the Railroad's yard.

On November 15, 1960, one of the Railroad's employees, Harvey P. Geiger, was walking in the Railroad's yard, under the State's overpass, when he was struck in the head by something which claimant said was a large plywood sign which the State had allegedly used as a part of a cement form and failed to remove from the area after completion of construction work on its overpass. Harvey Geiger was knocked to the ground by the object that struck his head, and he was rendered unconscious.

The Railroad was operating under and subject to the provisions of the "Federal Employers' Liability Act", *Title 45, U.S.C.A. §51 et seq.* That statute obligated the Railroad to provide its employees with a safe place to work. The injured employee hired a lawyer and filed suit for damages against the Railroad in the Circuit Court of Cook County [No. 62C 1592].

The injured employee, having elected to sue his employer, the Railroad, under the *Federal Employers' Liability Act*, did not bring any action against the State. However, the Railroad gave due and timely notice to the State of the injury to its employee; advised the Attorney General and the Secretary of State that its employee's injury was due to the State's negligence; and invited the State to participate in the pending suit against the Railroad. The State ignored the Railroad's invitation to participate in the suit or in the ultimate settlement.

Railroad gave the State advance notice of the proposed settlement, and eventually paid its injured em-

ployee $14,000 in settlement of the Circuit Court action. Railroad then filed this claim against the State for indemnification.

During the course of the three separate hearings in this court, at the close of the Railroad's evidence, pursuant to §64(5) of the *Civil Practice Act*, the State moved for judgment in its favor and dismissal of the suit.

The State argued in its motion that is was entitled to judgment under one of two alternative theories:

(1) Since the evidence submitted by Railroad at the hearing all tended to prove that the State was negligent, and since the Railroad judicially admitted its own negligence by making a substantial settlement in the suit brought against it by its employee, the State could be in no worse position than that of a joint tort-feasor. As such, the State argued, it is not liable under the general rule and the common law principle that there is no right to indemnity between joint tort-feasors.

(2) If the Railroad were not in fact guilty of any negligence, as it seems to contend, then it acted only out of generosity in settling the suit filed against it by its injured employee, and, in effect, made a gift to its employee of $14,000.

We denied respondent's motion to dismiss, at the close of claimant's evidence, for several apparent reasons. First, the State did not concede its own negligence except for the purpose of advancing the argument in theory (1) of its motion. Since we felt that the outcome of this case may depend on the proof of facts concerning the State's negligence, respondent should proceed to adduce evidence in support of its defense on that issue.

Secondly, this court recognizes the well-established exceptions to the rule against contribution between joint tort-feasors. *I.L.P. Contributions §5.* One such exception, applicable here, is found in the cases where a third person [here allegedly, the State] caused a liability for the employer under the strict terms of the *Federal Employers' Liability Act* (Supra). F.E.L.A. is a unique statute governing the liability of railroads for injuries sustained by railroad employees in the course of their work. It is somewhat similar to a workmen's compensation act. It is described by the U. S. Supreme Court in *Sinkler* v. *Missouri Pacific R. Co., 353 U.S. 326* at page 329 as ". . . an avowed departure from the rules of common law . . . a response to the special needs of railroad workers".

As the Railroad contends here, a company operating under the F.E.L.A., may be "guilty of only passive technical negligence" while the active and primary negligence is that of another. This rule is well stated by Justice Schwartz in *Gulf, Mobile & Ohio R. Co.* v. *Arthur Dixon Transfer Co., 1951, 343 Ill.App. 148.* Paragraph 4 of the syllabus gives the gist of this case as follows:

"[Indemnity—complaint by railroad for amount paid to its employee injured by transfer company.] Complaint by railroad company to recover from transfer company moneys paid in settlement of switchman's claim for injuries sustained during switching movement when he was caught between boxcar and transfer company's motor truck parked close to railroad tracks stated a cause of action, when understood as alleging that railroad company was guilty only of passive technical negligence and that the active and primary negligence was that of transfer company in placing its truck where it was a danger to employees of railroad company."

In a more recent common law indemnity case, *Sleck* v. *Butler Brothers, 1964, 53 Ill.App. 2d 7,* the court restated the Illinois law of common law indemnity.

In the *Sleck* case, involving a breach of the "Structural Work Act" *(Ill.Rev.Stat. Ch. 48, §§60-69)* the court said at page 15:

"A party who is legally responsible but not actively at fault may obtain contribution from the party who is actively at fault. In situations where a party is found guilty of common law negligence, the party may be found guilty of only passive negligence and therefore entitled to contribution from the active tort-feasor. *Blaszak v. Union Tank Car Co., 37 Ill. App. 2d 12, 184 NE 2d 808 (1962).* In situations where a party is charged with a violation of the Structural Work Act, he may seek contribution on the basis that his violation was passive, whereas another was guilty of an active violation of the act."

Significantly, in view of the claimant's allegations in the case at bar, the court further stated in *Sleck* at page 15:

"The fact that the principal case was settled and a consent judgment entered reflecting that settlement does not affect the third-party plaintiffs' right to seek contribution, whether the damages were sought for the violation of a statutory duty, as in the Sack case, or were sought for the violation of a common law duty, as in *Gulf, M. & O. R. Co. v. Arthur Dixon Transfer Co., 343 Ill.App. 148, 98 NE 2d 783 (1951).*

This court has also tacitly recognized the right of a railroad-employer to reimbursement for sums paid to an injured employee where the injury resulted from the active negligence of the State. *Quilty v. State of Illinois* (1961) *24 C.C.R. 78,* involved a claim for injuries to an employee of the Chicago, Rock Island and Pacific Railroad Company. The injuries were sustained when the employee was working in his employer's yard at Blue Island, and was struck in the head by a large block of cement. At the time of the injury, the State was repairing a bridge which passed over the railroad yard where the employee was working. Air hammers were being used in the repair work, the vibrations loosened the concrete, and caused it to fall in the railroad yard below. Although the railroad-employer had paid certain medical bills of the injured employee, we permitted the employee to recover the damages because, as we said at page 80, "no subrogation claim was made by the railroad company . . . .".

The case at bar differs from *Quilty* (Supra) in that the employee here elected to proceed against his em-

ployer, the Railroad, for the latter's breach of a statutory duty under the *Federal Employers' Liability Act.* In *Quilty,* the employee proceeded against the State which was, in that case, admittedly the active tort-feasor. However, the method of procedure elected by the employee should not affect the rights of his employer to seek indemnity from the State, if the latter is found to be guilty of the negligence which caused the employee's injury.

So this case boils down to the questions of fact. To establish its claim for indemnity from the State, the Railroad must prove by the preponderence of the evidence that the injury to its employee, Harvey Geiger, was primarily caused by the negligence of the State.

The evidence is entirely circumstantial. There was no eyewitness to the injury of Harvey Geiger, the Railroad's employee. Geiger didn't know what hit him. He was dazed and temporarily unconscious by the blow to his head. He was told, after he got out of the hospital, that it was a board that hit him.

It appears from the evidence, that the board which hit Geiger was a large sign, painted on plywood ¾" thick and 4′ × 4′ square, advertising a friendly church. The sign read,

> "Welcome to
> Tinley Park
> CHURCH of CHRIST
> A Friendly Church"

This friendly church was located some 10 miles from the place of Geiger's injury. At some time before the State commenced the repair work on its bridge, and it was stipulated that "somewhere along the line," the church's sign had been posted for advertising purposes.

No witness could remember just where it had been posted. We think it is reasonable to infer that the church sign had been posted somewhere on the State's overpass. The State's construction foreman, William Raymond Hinshaw, remembered noticing the sign when he inspected the bridge and the area two weeks before the repair work started. However, Hinshaw said that the sign was gone when he came back to start the job, and that he never saw the sign again after that day, two weeks before the work commenced.

As job foreman, Hinshaw was at the work site every day while the repair work was in progress. The work commenced on August 3, and was completed on September 28. Geiger was injured on November 15, some 48 days after the State's work was finished, all of its equipment removed, and the work area cleaned up.

Railroad contends, that the church sign had been used by the State as a part of a cement form underneath the bridge; that, after the form was taken down, the sign was left on top of a pier from whence it became dislodged by the high wind on the night of the accident, fell or blew down, and struck Geiger on the side of his head.

The Railroad called two witnesses who said they saw the sign used by the State as a part of a cement form underneath the bridge in the area where Geiger was injured. Forrest Bennett, Railroad's yardmaster, said he could see the sign in use as a cement form every day from his work position on the high stand. Bennett was obviously confused, however, when he said that the first time he saw the sign used as a form was about two weeks before Geiger was hurt. As previously noted, the State's repair job was finished and the cement forms removed six weeks before Geiger's injury.

Bennett also said he saw the sign up there after it was no longer being used as a cement form; that he saw it laying down on the pier between two abutments, and that he had noticed it there for some period of time before Geiger was hurt.

Railroad's foreman, John Montsvil, confirmed Bennett's testimony as to seeing the sign used as a form, and later lying on the ledge of the pier. He said, "I saw it on the ledge, that is for sure." He described the sign as lying on the pier "at an angle with concrete chippings all over the place".

Both of Railroad's witnesses said they knew that the wind blows extra-ordinarily strong under the bridge, and that there was an unusually strong wind on the night of Geiger's injury. It couldn't be called a tornado, but the wind was too strong for a man to stand upon a railroad car.

At this point, it seems to the court that these two supervisory employees of the Railroad have admitted that they had knowledge of a dangerous condition, and did nothing about it. They saw the sign lying in a precarious position on top of a pier; knew the propensity for strong winds in the area; and should have known that the sign could blow off and fall on persons below. The least that such prudent men should have done, would be to notify the State to remove alleged dangerous sign. These supervisory employees are presumed to know that the *Federal Employers' Liability Act* required the Railroad to provide its employees with a reasonably safe place to work. Yet, according to their testimony, the State had left the sign on top of the pier when they finished their work six weeks before Geiger's injury. Thus, the Railroad had six weeks notice of this alleged dangerous condition and did nothing about it.

This tends to weaken Railroad's argument, that its negligence was only passive and technical, while the State's negligence was active and primary. Railroad states that its negligence consisted only of its failure to "discover" and "correct" a dangerous condition created by the State. Railroad's evidence shows that it had not failed to discover the alleged dangerous condition. It seems obvious that failure to correct an undiscovered and unknown dangerous condition suggests less guilt of negligence than failure to take any remedial measures after discovering a dangerous condition, regardless of who created it.

Before pursuing this reasoning to a conclusion, that the Railroad and the State were in *pari delicto,* or weighing their relative delinquencies which may have contributed to Geiger's injury, we are obliged to consider the State's evidence which completely contradicts the testimony of Railroad's witnesses on the essential facts concerning the State's alleged negligence.

Testifying for the State was its highway maintenance supervisor, Kenneth DeYoung, and its construction foreman in charge of the repair work on the bridge, William Raymond Hinshaw. Both men were on the job every day and inspected all work at the job site every working day during the forty-four day period required to complete the job. Neither of these men ever saw the church sign while the work was in progress, or during the clean-up afterwards. Each of them saw the sign only once. Hinshaw saw it hanging somewhere on the premises two weeks before the work started, but never saw it again after that day. DeYoung never saw it at all until several days after the accident when he went to the Railroad office to examine it at Railroad's request.

Both DeYoung and Hinshaw are positive that the

sign was not used as part of a cement form. They said that all plywood used for forms is either new wood or used forms that have been cleaned. They also said that the plywood used is always oiled so the cement will not stick to it. There is no evidence that the church sign had been oiled on either side.

DeYoung and Hinshaw were equally positive that no sign was left on top of any pier. They had personally inspected the tops of the piers from ladders and scaffolds. Hinshaw described the procedure for cleaning off the top of the piers where the work was performed. He said they use air hose to blow off mud and dirt.

Hinshaw said he called two men from the Railroad by the name of Smith and Drake, and they went over the bridge with him and inspected it before the State moved the lights and barricades from the top of the bridge. He said they had to O.K. the job before he could move out. The inspection of the piers with the two railroad men was a visual inspection from the ground, but we note that this is the same position from which Railroad's witness, Mr. Montsvil claims he saw the sign at an angle on top of the pier. It was not noticed by the Railroad men, Smith and Drake.

For that matter, the Railroad's injured employee, Harvey Geiger, never saw the sign before his accident. He was a yard foreman who worked under and around the bridge every day. Geiger testified that he never saw the sign until after he was hit. He did not see the sign used as a cement form nor lying on top of pier. We felt that Geiger's testimony was more favorable to the State than to the Railroad.

Altogether, there were four other witnesses who testified as to the essential facts. Two were employed, by

and testified for the Railroad. Two were employed by, and testified for the State. All gave equally credible testimony, producing a direct conflict in evidence which we find was evenly balanced. Under these circumstances, we must hold that the claimant has not proved its case by a preponderance of the evidence, nor, in other words, by the greater weight of the evidence. *I.L.P. Evidence §345.*

As we said in *Boelkow v. State, 24 C.C.R. 47,* "Where there is a direct conflict in evidence, which is evenly balanced, claimant has not met his burden of proof". This rule applies to the case at bar.

This claim must be and is hereby denied.