818 F.2d 713
 Joe E. GARCIA, Plaintiff-Appellee,
v.
BURLINGTON NORTHERN RAILROAD COMPANY, Defendant-Appellant,
and
Association of American Railroads and National Association
of Railroad Trial Counsel, Amici Curiae.
 No. 84-1318.
 United States Court of Appeals,
Tenth Circuit.
 April 22, 1987.
 
 Richard D. Hall (C. Willing Browne and Alan Epstein, with him on the briefs) of Hall & Evans, Denver, Colo., for defendant-appellant.
 Michael L. Weiner of DeParcq, Perl, Hunegs, Rudquist & Koenig, P.A., Minneapolis, Minn. (Douglas John Traeger, Denver, Colo., and Norman Perl of DeParcq, Perl, Hunegs, Rudquist & Koenig, P.A., Minneapolis, Minn., with him on the briefs), for plaintiff-appellee.
 Peter J. Crouse and Walter J. Downing of Grant, McHendrie, Haines and Crouse, P.C., Denver, Colo., on the brief for Ass'n of American Railroads, amicus curiae.
 Albert J. Givray and Carol R. Goforth of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., on the brief, for National Association of Railroad Trial Counsel, amicus curiae.
 Before McKAY, SETH and TIMBERS*, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 Plaintiff, Joe E. Garcia, was an employee of defendant, Burlington Northern Railroad Company. He was seriously injured when an Electromatic Tamper backed over his left leg. The leg was amputated, and plaintiff sought recovery in a two-count complaint filed against defendant. Count one alleged that defendant was negligent under the Federal Employers' Liability Act, 45 U.S.C. Secs. 51-60 (1982) (FELA), and count two, based on the same facts, sought recovery for violations of the Boiler Inspection Act, 45 U.S.C. Secs. 22-34 (1982) (BIA). Both parties agree that while plaintiff's contributory negligence would reduce his recovery under FELA, it would not affect his recovery under the BIA.
 
 
 2
 After presentation of the evidence, the trial court submitted the matter to a jury. The court instructed the jury that the Tamper was a locomotive for purposes of the BIA and asked them to determine whether defendant, plaintiff or both were negligent. To assist the jury, the court submitted special interrogatories relating to plaintiff's claim of negligence and defendant's claim of contributory negligence. The jury returned a verdict for plaintiff on both counts and found that the damages were $2,000,000. However, as to count one, the jury found that plaintiff's contributory negligence caused twenty-five percent of his damages. The court stated that plaintiff could not receive more than one recovery and entered judgment for plaintiff and against defendant in the amount of $2,000,000 plus interest from the date of the judgment. This judgment was dated February 29, 1984, nunc pro tunc to February 24, 1984. Neither party filed any post-judgment motion, and defendant filed its notice of appeal on March 5, 1984. However, on November 29, 1984, the trial court issued a memorandum opinion and order stating that plaintiff was entitled to prejudgment interest. The court also issued an amended judgment that granted plaintiff interest on the $2,000,000 recovery from July 13, 1982, the date of the accident. Upon appeal, defendant contends that plaintiff is not entitled to recover under the BIA or to receive prejudgment interest.
 
 I. Recovery under the Boiler Inspection Act
 
 3
 Defendant first argues that it is not subject to the BIA because the Electromatic Tamper is not a "locomotive." The trial court denied defendant's motion for summary judgment on this issue and instructed the jury that the Tamper is a locomotive for purposes of the BIA. Both parties agree that if the Tamper is not a locomotive, defendant is not subject to the BIA, and plaintiff can recover only on his FELA claim.
 
 
 4
 The BIA was enacted in 1911, when railroads used steam locomotives. The boilers in steam locomotives could explode violently and cause serious damages to persons and property. Consequently, railroads were subjected to strict liability for violations of the BIA. Even more important to plaintiff, contributory negligence was not a defense and did not reduce a plaintiff's recovery.
 
 
 5
 When railroads began using other locomotives, courts extended coverage of the BIA. Essentially, they decided that since the BIA was a remedial statute, it should be construed liberally to protect railroad workers against harm caused by defective railroad equipment. United States v. Fort Worth & D. Cent. Ry., 21 F.Supp. 916, 917 (N.D.Tex.1937); Duchsherer v. Northern Pac. Ry., 4 Wash.App. 291, 293, 481 P.2d 929, 932 (1971). As a result, numerous vehicles were labeled locomotives under the BIA. However, courts have never said that all railroad vehicles will be locomotives; rather, they have consistently held that a vehicle will be a locomotive only if it is used as a locomotive. Baltimore & O. Ry. v. Jackson, 353 U.S. 325, 329, 77 S.Ct. 842, 845, 1 L.Ed.2d 862 (1957); Hoffman v. New York, N.H. & H. R.R., 74 F.2d 227, 232 (2d Cir.1934); Duchsherer, 4 Wash.App. at 293, 481 P.2d at 932. A study of the cases reveals two requirements: first, the vehicle must operate on railroad tracks; and second, it must perform a locomotive function.
 
 
 6
 Numerous courts have held that vehicles that push or pull railroad cars along railroad tracks are locomotives. E.g., Hoffman, 74 F.2d at 232. Even if the pushing and pulling is only along the tracks within the railroad's own yard, the vehicle is acting as a locomotive and, thus, is a locomotive under the BIA. Atchison, T. & S.F. Ry. v. United States, 403 F.2d 211, 212-13 (10th Cir.1968). In Mazzucola v. Pennsylvania R.R., 281 F.2d 267 (3d Cir.1960), the court further defined this requirement in relation to a caterpillar that was used to push and pull railroad cars to and from a loading dock. The court stated that, because the caterpillar "runs on its own tracks, not those of the railroad," it is not a locomotive. Id. at 268-69. Thus, a vehicle can be a locomotive only if it operates on railroad tracks. The Tamper meets this requirement because it operates along railroad tracks, both while moving to and from the job site and while in operation at the job site.
 
 
 7
 The requirement that vehicles perform locomotive functions has been liberally construed. As noted in Atchison, even if the vehicle only operates within the railroad's own yard, it can be a locomotive. 403 F.2d at 212-13. Furthermore, a crane used to unload boulders at a railroad construction site is a locomotive if it pushes or pulls cars loaded with boulders to and from the construction location. Fort Worth, 21 F.Supp. at 918-19. A motor car becomes a locomotive if it is used to push or pull any other car along the railroad tracks. Duchsherer, 4 Wash.App. at 293, 481 P.2d 932. In fact, in Jackson, the Supreme Court was faced with a motor car that pulled only a hand car. The hand car was used to carry material, tools and equipment to the site where workers were repairing railroad tracks. However, since the motor car pulled another car, the Court found that it was subject to acts governing locomotives. 353 U.S. at 329-30, 77 S.Ct. at 845. Thus, one locomotive function is pushing and pulling cars along railroad tracks.
 
 
 8
 In arguing that the Tamper is a locomotive, plaintiff focuses on the pushing and pulling functions of the Tamper. He claims these functions are the same as those performed by the crane in Fort Worth or the motor car in Jackson. Thus, our decision turns on whether the pushing and pulling done by the Tamper is the same as the pushing and pulling done by vehicles that have been considered locomotives.
 
 
 9
 The Tamper is a vehicle specifically designed to align tracks. When performing this function, the Tamper uses two metal apparatus: a projector buggy that is pushed along the track and a receiver buggy permanently installed on the rear of the Tamper. The projector buggy consists of a welded metal frame attached to four small wheels. Three light projectors are mounted on the frame and direct beams of light toward the Tamper. The receiver buggy, which can be lowered to the tracks, is actually a single metal "utility" bar with two small wheels.
 
 
 10
 When the Tamper is aligning tracks, the projector buggy is placed from twenty-five to one hundred feet in front of the Tamper. Connecting rods, called spacer buggies, establish and maintain a constant distance between the projector buggy and the Tamper. If the tracks are properly aligned, beams of light from the projectors are intercepted by a shadow box mounted on the Tamper. However, if there is any misalignment--either because the tracks are not vertically or not laterally aligned--the light reaches one or more of three receivers. One receiver is mounted on the receiver buggy and two receivers are mounted on a metal bar directly behind the cab of the Tamper. Each receiver contains an infrared sensitive photocell and, when light from the projectors reaches any receiver, a bell sounds to notify the operator that the track is not properly aligned.
 
 
 11
 If there is misalignment, the operator activates the Tamper's jacking function. Rail clamps reach down to seize the track and automatically activated hydraulic jacks raise the track until it is vertically adjusted. The jacking function then terminates and the aligning function positions the track laterally. When light from the projectors no longer reaches the receivers, the tracks are properly aligned. Meanwhile, the tamping function consolidates ballast under the tracks to maintain their proper position. When this operation is completed, the clamps release the track and the Tamper continues down the railroad line, repeating this sequence of functions.
 
 
 12
 At the end of its operations, the Tamper is prepared for its travel back to the railroad station. The receiver buggy is moved to a raised position on the back of the Tamper, while the projector buggy is placed on its own bracket which is mounted on the front of the Tamper. While traveling to and from the job site, the Tamper and its two buggies are a compact, self-contained unit. The Tamper does push and pull buggies, but only during its operation, and then the buggies are an integral part of the Tamper's special design. Indeed, without the projector buggy and the receiver buggy, the Tamper could not carry out its track aligning tasks.
 
 
 13
 Because of its sensitive nature and special design, the Tamper does not push or pull anything other than its own buggies. From time to time the operator may carry equipment or tools that assist him or his crew in aligning the tracks. However, these items are carried directly on the Tamper and are not loaded into some other car that is then pulled by the main vehicle. Thus, the Tamper is different from the motor car in Jackson, 353 U.S. at 327, 77 S.Ct. at 844 (tools loaded in separate hand car). Furthermore, the Tamper does pushing and pulling only when it is performing its own particular functions at the work site. Thus, the pushing and pulling done by the Tamper is not the same conveyance pushing or pulling normally done by a locomotive.
 
 
 14
 For convenience in comprehending the design and function described above, we reproduce here the photographs submitted in evidence. Photographs 1, 2 and 3 sequentially show the projector buggy: (1) being transported to the work site (photograph 1); and (2) as it relates to the Tamper when operating at the job site (photographs 2 and 3). Photograph 6 shows the receiver buggy in transit to the job site. Photographs 4 and 5 show the receiver buggy in operation at the job site. Finally, photograph 7 shows all three components of the Tamper as they appear in operation at the job site, the only time the wheels of the projector buggy and the receiver buggy are engaged with the tracks.
 
 
 15
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 16
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 17
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 18
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 19
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 20
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 21
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEThe unique integration of the "buggies" into the Tamper distinguishes it from the crane in Fort Worth. When the crane was performing its specialized function of lifting boulders and placing them under the tracks, it was not a locomotive. However, it was a locomotive when it performed the separate function of pushing or pulling railroad cars to and from the job site. 21 F.Supp. at 918-19. The Tamper, on the other hand, pushes and pulls nothing to and from the job site. Furthermore, any pushing or pulling at the job site is integral to the Tamper's special work site function. Unlike the crane, the Tamper must have its appurtenances to perform its specialized function. Therefore, we conclude that the Tamper performs no locomotive function, even though it operates on a railroad track. While we recognize that the BIA should be liberally construed, its coverage cannot be extended indefinitely. For purposes of the BIA, the Tamper is not a locomotive.**
 
 
 22
 Since the Tamper is not a locomotive, defendant is not subject to, and plaintiff cannot recover under, the BIA. However, plaintiff can still recover under FELA, and defendant has not challenged the jury verdict on that count. Under FELA, plaintiff's recovery must be reduced by twenty-five percent to reflect the injuries caused by his contributory negligence. Plaintiff is entitled to judgment in the amount of $1,500,000 plus interest from February 24, 1984.
 
 II. Prejudgment Interest
 
 23
 Defendant argues that plaintiff is not entitled to prejudgment interest. In its initial order, the trial court did not mention prejudgment interest. However, on November 29, 1984, after defendant had filed a timely notice of appeal and without any motion from plaintiff, the court amended its initial order to include interest from the time of the accident, Garcia v. Burlington N.R.R., 597 F.Supp. 1304 (D.Colo.1984). Defendant contends that the trial court did not have jurisdiction to amend the judgment to grant prejudgment interest.
 
 
 24
 Filing a timely notice of appeal pursuant to Fed.R.App.P. 3 transfers the matter from the district court to the court of appeals. Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam); Gryar v. Odeco Drilling, Inc., 674 F.2d 373, 375 (5th Cir.1982). The district court is thus divested of jurisdiction. Any subsequent action by it is null and void. Offshore Logistics Servs., Inc. v. Mutual Marine Office, Inc., 639 F.2d 1168, 1170 (5th Cir. Unit A Mar. 1981); Taylor v. Wood, 458 F.2d 15, 16 (9th Cir.1972). In collateral matters not involved in the appeal, however, the district court retains jurisdiction. Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1550-51 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); Akerly v. Red Barn Sys., Inc., 551 F.2d 539, 543 (3d Cir.1977). Thus, when an interlocutory appeal is taken, the district court retains jurisdiction to proceed with matters not involved in that appeal. Taylor v. Sterrett, 640 F.2d 663, 667-68 (5th Cir. Unit A 1981). More important to plaintiff, courts have found certain matters to be collateral to a final judgment. See, e.g., Haas v. Pittsburgh Nat'l Bank, 495 F.Supp. 815, 817 (W.D.Pa.1980); see also Keasler v. United States, 585 F.Supp. 825, 833-34 (E.D.Ark.1984), aff'd, 766 F.2d 1227 (8th Cir.1985). For example, even after a timely notice of appeal is filed, a district court may retain jurisdiction to determine the propriety and amount of attorney's fees. Cox, 784 F.2d at 1550-51.
 
 
 25
 Conversely, the determination of damages is an integral part of the merits decision and not a collateral matter. See Kaszuk v. Bakery & Confectionary Union, 791 F.2d 548, 553 (7th Cir.1986) (order not appealable as final disposition because court had not fixed damages). Thus, even a matter normally considered collateral may be a part of the merits decision if it is a portion of the damages. For example, the Second Circuit stated that when in a contract action in which "attorneys' fees are a contractually stipulated element of damages, a judgment is not final until the fees have been determined." F.H. Krear & Co. v. Nineteen Named Trustees, 776 F.2d 1563, 1564 (2d Cir.1985) (per curiam). Even though this court has decided that attorney's fees are always collateral, Budinich v. Becton Dickinson & Co., 807 F.2d 155, 157 (10th Cir.1986) (per curiam), that decision is based on practical considerations rather than on the theoretical classification of attorney's fees. In reality, a court cannot determine the amount of attorney's fees until it has reached a final determination on the other issues in the case. Thus, issues arising in a determination of attorney's fees will always follow a decision on the merits. Furthermore, the lack of a standardized approach "is particularly unsuited to a jurisdictional rule that requires forfeiture of an appeal for noncompliance." Id. at 157. Thus, practical concerns make it desirable to classify all attorney's fees as collateral.
 
 
 26
 In contrast, prejudgment interest, if permissible, must be a part of the primary damage relief sought. Any evidence relating to prejudgment interest is available when the other issues are tried, and thus, there is no reason to delay a decision on prejudgment interest until after the merits of a case are decided. If plaintiff is entitled to any prejudgment interest, it must be as a portion of his damages. While this court has not recognized the right to prejudgment interest in FELA cases, it is clear that even if it did, it would be based on the notion that it is a part of the basic economic loss of the prevailing plaintiff. "The interest foregone on lost income or on money spent for out-of-pocket expenses from the date of loss to the time of compensation is as much a part of making an injured party whole as is the calculation of her wage rate." Wilson v. Burlington N. R.R., 803 F.2d 563, 566 (10th Cir.1986) (McKay, J., concurring).
 
 
 27
 This case demonstrates why a determination of prejudgment interest is not a collateral issue. Plaintiff specifically asked permission to amend its complaint to include prejudgment interest, and the trial court granted that motion by amending the pretrial order. However, the court did not mention prejudgment interest in its final order and did not reserve the matter. Plaintiff could have filed a motion asking the court to reconsider, but chose not to seek reconsideration. Defendant, relying on the court's order as a final judgment, filed a timely notice of appeal and the case was transferred to the court of appeals. The trial court no longer had jurisdiction to sua sponte amend its order. As a result, the trial court's November 29, 1984, order granting prejudgment interest must be vacated.
 
 
 28
 The case is reversed and remanded to the district court with instructions to enter judgment in accordance with this opinion.
 
 
 
 *
 Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 **
 Since we find that the Electromatic Tamper is not a "locomotive," we do not need to reach defendant's argument that it did not violate the BIA