978 A.2d 822

**Michele COLLINS**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION.**

**No. 2154, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Aug. 27, 2009.

P. Matthew Darby (Guy M. Albertini, Albertini & Darby, LLP, on brief), Baltimore, for Appellant.

Stephen Caplis, Emily Dancker (Whiteford, Taylor & Preston, on brief), Baltimore, for Appellee.

Panel: MEREDITH, WOODWARD and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

WOODWARD, J.

This case arises from a tragic accident that led to the death of thirty-five year old Robert Collins ("the Decedent"). In the early morning hours of February 17, 2005, just south of Havre de Grace, Maryland, the Decedent was working as an Electric Traction Lineman for appellee/cross-appellant, National Railroad Passenger Corporation ("Amtrak"), as a member of a five-man crew headquartered out of Amtrak's Perryville Maintenance of Way Base. At approximately 3:56 a.m., the Decedent sustained severe electrical burns on approximately 60 percent of his body when he was on top of a catenary maintenance vehicle and came in contact with the energized pantograph.[1] The Decedent was transferred by a Maryland

---

1. A catenary system is a system of wires suspended between poles and bridges supporting overhead contact wires normally energized with electricity. In general, a pantograph is a device located on top of an electric engine that collects power from the overhead contact wire by means of a sliding shoe.

State Police Medivac crew to the Johns Hopkins Bayview Burn Center, where he passed away on February 21, 2005.

Appellant/cross-appellee, Michele Collins ("Collins"), the Decedent's surviving spouse, filed suit under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et seq.*, asserting claims of negligence and strict liability, respectively, against Amtrak. After a five-day trial, the jury returned a verdict in favor of Amtrak.

On appeal, Collins presents three questions for our review, which we have rephrased:

1. Did the trial court abuse its discretion in not instructing the jury that assumption of risk is not a defense to a claim arising under the FELA?

2. Did the trial court err in granting partial summary judgment in favor of Amtrak on Collins' claim arising under the LIA?

3. Did the trial court abuse its discretion in not admitting statements from a transcript of a conversation between Amtrak employees?

We answer "No" to each question and, accordingly, shall affirm the judgment of the circuit court.[2]

## BACKGROUND

The Decedent began working for Amtrak in November 1997 as an Electric Traction Lineman at Amtrak's Mid–Atlantic Division–South, which covered the Baltimore and Perryville area. Such work entailed maintenance and construction of the overhead catenary system, substations, and supply stations along Amtrak's Northeast Corridor. Normally, about 12,000 volts of electricity travel through the catenary system, powering the trains along Amtrak's Northeast Corridor.

---

**2.** Amtrak filed a conditional cross-appeal requesting that this Court address additional questions presented by Amtrak if, for any reason, we decide to reverse. Because the judgment of the circuit court will be affirmed, we do not reach Amtrak's questions on cross appeal.

Crews of Amtrak employees, each directed by a "gang foreman," maintain the catenary system. The Decedent was a member of a five-man crew, or "gang," designated D–126, headquartered at Amtrak's Perryville Maintenance of Way Base. The gang worked during the hours of 10 p.m. to 6 a.m., Monday through Friday.

One means of maintaining the catenary system requires measuring the alignment of the overhead contact wire using a catenary maintenance vehicle ("Cat Car"). The Cat Car is a diesel-powered rail car and is used to take alignment readings usually under a de-energized catenary system. The roof of the Cat Car is equipped with a pantograph, which is raised to the overhead contact wire of the catenary system to assist in taking alignment readings of the wire. When attached to an energized contact wire, however, the pantograph collects power, becoming part of the energized catenary system.[3] After being detached and lowered from the energized contact wire, the pantograph is de-energized. When it is not in use, the pantograph is secured with an automatic hold-down latch. Additionally, in the Decedent's gang, the pantograph was tied down with a rope as an added means of securing it in the lowered position.

On February 16, 2005, the Decedent's crew started to work at about 10:00 p.m. In addition to the Decedent, the gang included Thomas Boone, the Gang Foreman; George Breder, the Cat Car Operator; Jack Backert, an Electric Traction Lineman; and Bryan Marshall, an Electric Traction Lineman Trainee.

Initially, the crew was assigned to perform routine catenary maintenance work on a section of the catenary system. The Decedent was designated the "A-man" at the start of this shift. As the A-man, it was the Decedent's responsibility to coordinate the removal of power in the area where the crew worked. Prior to performing their work, the pantograph was

---

**3.** The pantograph is also used as a ground when connected to the de-energized contact wire. It assists in de-energizing any residual power that may be left in the catenary system when the system is turned off.

raised, attaching it to the contact wire, which was de-energized at the time. At approximately 2:40 a.m. on February 17, 2005, the crew was asked to leave the area. A Norfolk–Southern freight train broke down near the crew's work site, necessitating that the track occupied by the Cat Car be cleared, so that the railroad could be opened to service the disabled freight train. Boone lowered the pantograph and Collins tied it down. The power to the catenary lines was then restored.

The crew was diverted to the Aberdeen area, where they stayed for about 45 minutes until they were requested to conduct further alignment readings of the catenary system. The readings were to be taken over the distance of about 1500 feet, or five catenary poles ("cat poles").[4] Because the work was going to be done under energized catenary wires, Boone conducted a safety briefing before the crew set out to complete the readings.

After the alignment readings were finished, the crew observed a bright flash, followed by an explosion and a thump on the Cat Car roof. Boone testified that he immediately took a head count and did not see the Decedent. He explained that, "[j]ust from hearing the explosion and seeing the sky light up, [he] knew what it was." Boone ran to the top of the Cat Car where he found the Decedent lying "between the pantograph and the railing of the [Cat Car]" with his body "in flames" and "screaming for help." Boone proceeded to put out the flames on the Decedent's body with a fire extinguisher. According to Boone, the Decedent's clothes "had been burned completely off."

It was later determined that at approximately 3:56 a.m. the Decedent sustained severe electrical burns on approximately 60 percent of his body when he came in contact with the energized pantograph while on top of the Cat Car. The Decedent had climbed on top of the roof of the Cat Car

---

4. The cat poles are numbered, and as the gang travels the required distance, the alignment readings are documented with reference to the cat pole numbers.

without direction from the gang or Boone and without the knowledge of any of his gang members. Amtrak's Accident Investigation Report stated, and the testimony at trial confirmed, that, other than to tie down the pantograph, there was no reason for the Decedent to have gone on top of the Cat Car at that particular time. Because the members of the gang were in the cabin of the Cat Car at the time that the Decedent went up on the roof, there were no eyewitnesses to the accident.

Lowering the pantograph requires communication between the A-man and the Cat Car Operator. Two methods of lowering the pantograph were used by crews in the Mid–Atlantic Division–South: (1) While at the top of the steps or on the roof, the A-man would yell to the Cat Car operator to lower the pantograph; or (2) the A-man would stomp on the roof of the Cat Car near the pantograph above the Cat Car Operator's controls.[5] The second method required the A-man to straddle a removable railing located on the Cat Car roof. Evidence of the Decedent's injuries suggested that he was in this position at the time that he sustained his injuries, because the Decedent suffered severe burn marks in his right wrist and groin area, which was consistent with straddling (and thus contacting) the movable railing and simultaneously contacting the energized pantograph with his right wrist. Burn marks were also found on the removable railing.

Following the accident, the Decedent was transported by a Maryland State Police Medivac crew to the Johns Hopkins Bayview Burn Center where he passed away on February 21, 2005, at approximately 2:15 p.m. following the removal of life-support systems.

■■ Collins filed suit under the FELA and LIA, asserting claims of negligence and strict liability, respectively, against Amtrak.

---

**5.** The second method of lowering the pantograph, when employed under an energized line, placed the employee within three feet of the energized circuits in violation of Amtrak policy requiring at least a three foot distance between Amtrak employees and energized lines and equipment.

FELA and LIA are remedial and humanitarian statutes that impose two separate types of liability to protect the safety of railroad employees. FELA permits railroad workers to recover for injuries caused by the negligence of their employers or fellow employees. LIA, on the other hand, imposes an absolute duty on railroad carriers to ensure that their locomotives are both properly maintained and safe to operate. Because LIA does not create an independent cause of action, such a claim must be brought under FELA.

*Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir.2001) (citations omitted) (internal quotations omitted).

On June 5, 2006, Amtrak filed a motion for partial summary judgment on Collins' claim arising under the LIA, asserting that the Cat Car is not a locomotive and thus the LIA is inapplicable to Collins' claim under that statute. On July 14, 2006, the court granted Amtrak's partial motion for summary judgment on the LIA claim.

A five-day jury trial was conducted from August 14 to 18, 2006, and resulted in a verdict in favor of Amtrak. This timely appeal followed. We will set forth additional facts and proceedings below as necessary to discuss the questions presented.

## DISCUSSION

### I.

### Assumption of Risk Jury Instruction

In 1906, Congress passed the FELA "in part to eliminate barriers common law courts erected to protect railroad companies and other common carriers from liability for their employees' workplace injuries." *Fashauer v. N.J. Transit Rail Operations, Inc.*, 57 F.3d 1269, 1274 (3d Cir.1995). The FELA "substituted comparative negligence for the strict rule of contributory negligence." *Id.* (internal quotations omitted). Following "widespread criticism" of the retention of assumption of risk as a complete defense to an employer's liability,

Congress amended the FELA in 1939, "eliminat[ing] the defense in cases where the injury 'resulted in whole or in part from the negligence of any of the officers, agents, or employees' of the employer." *Id.* (quoting 45 U.S.C. § 54). Thereafter, the Supreme Court announced that "every vestige of the doctrine of assumption of risk was obliterated from [the FELA] by the 1939 Amendment," directing that FELA cases are "to be handled as though no doctrine of assumption of risk had ever existed." *Tiller v. Atl. Coast Line R.R. Co.,* 318 U.S. 54, 57, 64, 63 S.Ct. 444, 87 L.Ed. 610 (1943).

■ In the instant case, Collins proposed that the jury be instructed that assumption of risk is not a defense in a FELA action. The proposed instruction stated:

45 U.S.C. § 54 of The Federal Employer's Liability Act provides in pertinent part

In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to ... any of its employees, such employees shall not be held to have assumed the risks of his employment where such injury ... resulted in whole or in part from the negligence of any of the officers, agents or employees of such carrier....

Assumption of the risk is not a proper defense in a FELA action and as such it may not be considered in any way in reaching your decision.

(Alterations in original).

Amtrak's counsel excepted to the proposed instruction, and the following colloquy took place:

[COLLINS' COUNSEL]: ... Here, comparative negligence is certainly an issue. We believe that because of the potential overlap with assumption of risk and contributory comparative negligence, that it's imperative that the jury be given sort of the upper parameters of what actions are appropriate to be considered, and clearly there is a difference. I understand legally it is an issue that is complicated, but nonetheless, it's the law, and I think that they should be instructed and we ought to be

able to argue that whatever actions on the record, any evidence—

THE COURT: But the Court is not intending to instruct at all on assumption of the risk. That's not injected in any way into the case. So to give that instruction, I thought it would just further muddy the waters potentially of the jurors' understanding of what they were or were not being asked to decide.

[COLLINS' COUNSEL]: And I understand that, Your Honor, and I understand and in cases I have felt that the issue of instructing on assumption of the risk is a danger because it's not even in the case, okay. But here, I think it's potentially, depending on how the jury interprets facts, it is potentially—

THE COURT: I'm not going to allow anybody to argue assumption of the risk. That isn't in the case. There's not going to be any argument that would potentially confuse the jury based on the instructions.

[COLLINS' COUNSEL]: But I think it could be because, and also it's not only what is argued, but it's the inferences that the jury may draw on their own. In other words—

THE COURT: The jurors are going to come in and say, well, I know that there are two doctrines. One is assumption of the risk. The other is contributory/comparative negligence.

[COLLINS' COUNSEL]: No, but what I think—

THE COURT: You got rid of all those people.

[COLLINS' COUNSEL]: What might happen is that they could say they believe [the Decedent] was standing there, he knew that the [pantograph] was energized and he took, you know, the classic voluntarily assuming, getting close to the [pantograph] to do his job.

THE COURT: But here's my point. First, is it a correct statement of law, I don't have any argument with that, but obviously I'm not, you know, I'm not giving pedestri-

an instructions and other instructions that are inapplicable.

I think that both counsel understand and can argue the portion that pertains to the comparative/contrib and keep that as clear as possible, so I'm going to deny that.

Collins argues that the trial court erred in refusing to instruct the jury that assumption of risk is not a defense in a FELA case. Collins contends that, whereas the instruction is a correct statement of law and was not fairly covered by the other instructions given, whether such an instruction was proper "turns upon whether there was evidence before the jury upon which an inference could be drawn that [the decedent] assumed the risk of his injuries." According to Collins, "there was ample evidence from which the jury could have, and most likely did, improperly draw the conclusion that [Collins] should not recover because [the Decedent] assumed the risk of the incident."

Amtrak counters that the court properly denied Collins' request, because "the evidence and arguments of counsel did not raise the defense of assumption of risk." Instead, Amtrak asserts that the evidence and argument at trial "fell well within the category of comparative negligence."

█ Maryland Rule 2–520 provides in pertinent part:

(a) **When given.** The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when appropriate. In its discretion, the court may also give opening and interim instructions.

\* \* \*

(c) **How given.** The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Accordingly, a court may decline to give a requested instruction in the event that the instruction is "superfluous," "confus-

ing," or "inapplicable to the case at hand." *S. Mgmt. Corp. v. Mariner,* 144 Md.App. 188, 198–99, 797 A.2d 110 (2002). At issue in the case *sub judice* is whether instructing the jury on assumption of risk is applicable to the evidence generated at trial.[6]

Because contributory negligence reduces a plaintiff's damages under the FELA while assumption of risk does not, "courts have the delicate job of separating out evidence on one theory from evidence on the other." *Fashauer,* 57 F.3d at 1274. When inapplicable under the facts of a given case, "courts should spare juries intricate descriptions of opaque legal doctrines," such as the doctrine of assumption of risk; however, when "the facts of the case present a danger of jury confusion on the issue, an assumption of risk charge should be given." *Id.* at 1275. The United States Court of Appeals for the Third Circuit explained:

> [W]hen the evidence adduced at trial presents a danger that the jury might reduce a plaintiff's recovery based on the impermissible theory of assumption of risk, then the trial judge should instruct the jury on how that doctrine differs from contributory negligence. But when the evidence presents no such danger, then an adequate charge on contributory and comparative negligence suffices. Of course, the most difficult part of the inquiry is determining when the facts merit an assumption of the risk instruction.

*Id.*

"Although there is some overlap between assumption of risk and contributory negligence, generally the two defenses are not interchangeable." *Taylor v. Burlington N. R.R. Co.,* 787 F.2d 1309, 1316 (9th Cir.1986).

"At common law an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties constitutes an assumption of risk. Contributory negligence, in contrast, is a careless act or

---

**6.** It is not in dispute that Collins' instruction on assumption of risk was a correct statement of law and was not fairly covered by the other instructions.

omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist."

*Fashauer,* 57 F.3d at 1275 (quoting *Taylor,* 787 F.2d at 1316); *accord Jenkins v. Union Pac. R.R. Co.,* 22 F.3d 206, 210 (9th Cir.1994); *Rivera v. Farrell Lines, Inc.,* 474 F.2d 255, 257 (2d Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973). A finding of an employee's contributory negligence on the basis of "the strength of [the employee's] knowledge that a dangerous condition in his line of duty existed and his working in that line of duty" nonetheless, is actually "assumption of risk masquerading under another name." *Rivera,* 474 F.2d at 257–58. In other words, evidence of a plaintiff's "knowledgeable acceptance of a dangerous condition" implicates the defense of assumption of the risk, not contributory negligence. *Joyce v. Atl. Richfield Co.,* 651 F.2d 676, 682–83 (10th Cir.1981); *see also Koshorek v. Pa. R.R. Co.,* 318 F.2d 364, 367 (3d Cir.1963).

Noting that the concept of assumption of risk "often is used as an umbrella term to describe a number of discrete and dissimilar concepts," the United States Court of Appeals for the Third Circuit discussed in *Fashauer* "what theory of assumption of risk Congress sought to prohibit when it barred the defense under the FELA." 57 F.3d at 1275–76. The Court elucidated: "In our view, the history behind the FELA and the Supreme Court's pronouncements in pre- and post-FELA cases makes clear that assumption of risk in the employment context refers to implied consent," *i.e.,* an employee's implied consent to assume the risks entailed in employment. *Id.* at 1279. The Court held:

A plaintiff's recovery under the FELA never can be reduced on the basis that he or she implicitly consented to the risk by accepting employment with the railroad or by performing a task in the manner which the employer directed. This is true regardless of whether the plaintiff acted reasonably or unreasonably. Thus, even when a jury examining a plaintiff's position objectively would conclude that he acted unreasonably in accepting employment, or performing a

task at all, such unreasonable actions for FELA purposes are characterized as assumption of risk rather than contributory negligence.

*Id.* at 1280. In so holding, however, the Court further stated:

**[W]hen reasonable alternatives besides quitting or refusing to perform the task in an unsafe way are available, a plaintiff is charged with acting with due care and will be held responsible for acting unreasonably.** In such circumstances when the plaintiff **unreasonably** assumes a known risk, his fault in that regard is negligence and his damage award may be subject to apportionment. Examples of evidence of contributory negligence include failing to follow specific safety instructions reasonably calculated to protect the employee from the injury that occurred; failing to report a defect when the evidence establishes that such reporting would be productive; and failing to act prudently in performing the task.

*Id.* (first emphasis added) (second emphasis in original) (citation and internal quotations omitted).

■■■ Based on the aforementioned principles,

if no evidence of impermissible assumption of risk has reached the jury, a correct instruction on contributory negligence will do. However, if, either because of evidence introduced at trial or because of statements made by counsel in opening or closing arguments, there is a risk that the implied consent theory of assumption of the risk seeped its way into the case, the jury should be instructed that it may not find contributory negligence on the part of the plaintiff ... simply because he acceded to the request or direction of the responsible representatives of his employer that he work at a dangerous job, or in a dangerous place, or under unsafe conditions.

*Id.* (internal quotation omitted) (alteration in original).

## A

### Right of Refusal

In the case *sub judice,* Collins argues that a jury instruction on assumption of risk was necessary because "Amtrak relied

heavily upon the argument that [the Decedent] could have declined to perform the work in question if he thought it was dangerous," an Amtrak policy "referred to repeatedly . . . as the 'Right of Refusal.' " According to Collins, "[t]he explanation of this right and Collins['] failure to exercise the right could clearly have been interpreted as a 'voluntary, knowledgeable acceptance of a dangerous condition.' " We disagree and explain.

Preliminarily, we set forth a summary of the evidence adduced at trial relating to Amtrak's Right of Refusal. Amtrak elicited testimony from several witnesses that if the Decedent felt unsafe working under an energized line, he could have exercised his right of refusal *and still done the alignment readings, but under a de-energized line.* Boone testified that, had anyone felt unsafe, they had the right to refuse, agreeing that any member of the crew, including the Decedent, "could have said I want to work with the power off *and they would have worked with the power off.*" (Emphasis added).

Gerald Nangle, Amtrak's Director of Electrical Traction Maintenance, who was responsible for the day to day operation and maintenance to Amtrak's electric traction between Washington and Boston, testified that the Right of Refusal is that "[a]ny member of the engineering department has the right to refuse work that they feel is unsafe." When asked whether any member of the crew could have, "consistent with Amtrak policy, said I'm not doing this job *under energized* [sic]. We are going to call dispatch or whoever we have to call *and work under de-energized wire?,*" Nangle responded: "Yes, they could have." (Emphasis added).

During his testimony, Breder agreed that any member of the crew, once he learned that the job would be conducted under an energized line, had the right of refusal. According to Breder, Amtrak's Right of Refusal "is basically if you don[']t feel something is safe you bring it up and we try to make it safe *in order to do the job.*" (Emphasis added). Breder described Boone as the type of foreman who would

listen to an objection to a procedure and "say, you know thank you for bringing that up[.] I didn[']t notice that, or I didn[']t know that you would hesitant [sic] in doing this, *then we would do another way [sic] or make it safe.*" (Emphasis added). Backert testified that there were no exceptions to the Right of Refusal and stated that, during his fifteen plus years working for Amtrak, he never knew of any employee who had been disciplined for exercising his Right of Refusal.

Amtrak elicited additional testimony that neither the Decedent nor any member of the crew exercised his Right of Refusal on the night of the accident. Nangle testified that, on the night of but before the accident, the entire crew, including the Decedent, decided to do the alignment readings under an energized line. According to Nangle, the crew "indicated that they had discussed the job quite thoroughly and they were all quite aware of the situation, the catenary being energized and the pantograph being up and also being energized." Boone testified along the same lines, stating that the crew, including the Decedent, agreed that the alignment readings could be done *safely* under an energized wire.

In his closing argument, Amtrak's counsel discussed the Right of Refusal in the following manner:

I'm sure you're tired of this phrase. Most of you probably know it before I even put it up—[R]ight of [R]efusal. Had any member of the crew, including [the Decedent], **had they said no one can do this job under energized wire, you can do the job under de-energized wire, everyone testified that's what they would have done.** It's all (inaudible). That was their choice.

You heard unrefuted testimony that his right of refusal has been exercised. No one's ever been disciplined at Amtrak for exercising a [R]ight of [R]efusal. You want to talk about insubordination, insubordination is when you don't do your job. In other words, the crew's next job is to do the trolley assignment, so they'd say, well, that's fine, but we're tired and want to go home early. That's insubordination. That's easy.

Right of [R]efusal has to do, clearly, with the method of work. Amtrak, that company, I'm going to talk about that a bit at this point, empowers its employees with this right. I can't emphasize that enough because that's what set things in motion, sort of. We're going to get to what caused this, but no one exercised the [R]ight of [R] efusal.

(Emphasis added).

Contrary to Collins' contention, Amtrak's reference to the Right of Refusal was not for the purpose of arguing that the Decedent had the right to refuse to work under an energized wire, thereby implying that he voluntarily accepted working under a known dangerous condition. *Cf. Taylor*, 787 F.2d at 1316 ("The employee who enters the workplace for a routine assignment in compliance with the orders and directions of his employer or its supervising agents, who by such entry incurs risks not extraordinary in scope, is not contributorily negligent, but rather is engaging in an assumption of risk."). Instead, Amtrak used the Right of Refusal to show a safer alternative to conducting the catenary alignment readings under an energized wire, namely, doing the same job under a de-energized wire. Working under an energized line was not necessary for the Decedent and the crew to perform the alignment readings. In fact, about 99% of the time the crew performed the readings under a de-energized wire, and there was no advantage in terms of electrical engineering practices to taking readings under an energized line versus a de-energized line. Thus, under the circumstances of this case, the Right of Refusal was used to suggest a reasonable alternative, *"besides quitting or refusing to perform the task in an unsafe way," see Fashauer*, 57 F.3d. at 1280 (emphasis added), thereby raising the issue of contributory negligence, not assumption of the risk.

Furthermore, focusing precisely on the "theory of assumption of risk Congress sought to prohibit when it barred the defense under the FELA," it is clear that the evidence adduced does not show that the Decedent impliedly consented to "perform[ ] a task in the manner which [Amtrak] directed." *See Fashauer*, 57 F.3d at 1279–80. The crew did not receive

an order from Amtrak requiring them to conduct the readings under an energized wire. Rather, the crew decided that it would be safe to proceed under the energized system. *Cf. Green v. Union Pac. R.R. Co.*, 269 Ill.App.3d 1075, 207 Ill.Dec. 599, 647 N.E.2d 1092, 1099 (1995) (stating that, where the employee was complying with his supervisor's instructions and there was no alternative way for him to do his job, the evidence could have led the jury to believe the employee had assumed the risk).

Our review of the record reveals that none of the evidence adduced at trial with respect to Amtrak's Right of Refusal, nor the argument of counsel, expressly or implicitly injected assumption of risk into the trial. Accordingly, the trial court did not err in refusing to give Collins' proposed jury instruction on assumption of risk because of Amtrak's policy on Right of Refusal.

## B.

### On the Roof of the Cat Car

 Collins also argues that the circuit court should have instructed the jury on assumption of risk because, absent that instruction, "the jury may well have concluded that the sole cause of the incident was Collins' decision to proceed to the top of the [Cat Car] despite his knowledge of the danger, which resulted in a finding of no negligence."

Amtrak adduced evidence at trial that the Decedent was aware that the pantograph was energized when he went on top of the Cat Car presumably to tie down the pantograph. Nangle testified that there was no business-related reason for the Decedent to approach and get close enough to touch the pantograph while it was raised and connected to the energized contact wire. He testified that a red bar, located about 22 inches away from the pantograph, was positioned "to warn you of possible danger on the other side the that bar. That the pantograph could be energized." He further testified that, had the Decedent kept a safe distance from the energized pantograph and waited for it to come down to the latched position, the accident would not have happened. There was

also testimony from multiple witnesses that the Decedent violated Amtrak safety rule 2.202, a rule that "requires a worker to be three feet away from the catenary system when it is energized." Boone testified that the decedent never told him that he was going on the roof of the Cat Car or why he was going up there. All of this evidence tended to show that the Decedent departed from the standard of care and acted unreasonably under the circumstances, thus implicating the defense of contributory negligence and not assumption of risk. *See Joyce*, 651 F.2d at 682–83.

Moreover, there was a reasonable alternative available to the Decedent "besides quitting or refusing to perform the task in an unsafe way." *See Fashauer*, 57 F.3d at 1280. Nangle testified to "the normal procedure" where the A-man is positioned at the top of the stairs and yells to the operator, who is generally located at the bottom of the steps, to lower the pantograph. Nangle also testified that, even if the A-man was on the roof of the Cat Car when he yelled to the operator, the A-man would be about 15 to 20 feet from the pantograph and out of any danger of electrical injury. Boone testified to the same procedure, explaining that the Decedent should have been positioned at the top of the stairs of the Cat Car to call down to the operator to lower the pantograph. Breder testified that the A-man did not have to be on the roof to see that the pantograph was lowered. He explained that there was no visual obstacle between the Decedent and the pantograph once the Decedent got onto the roof and that the Cat Car roof was lighted at night.[7]

In light of the evidence adduced that (1) the Decedent violated the standard of care, (2) there was a reasonable alternative in instructing the operator to lower the pantograph, and (3) no crew member ordered the Decedent to go onto the roof of the Cat Car and somehow get close to the

---

7. As previously indicated, the other procedure for lowering the pantograph, to wit, stomping on the roof of the Cat Car above the operator's controls while straddling a removable railing, would violate Amtrak safety rule 2.202 that required at least a three foot distance between the Amtrak employee and the energized pantograph.

pantograph, we conclude that the doctrine of assumption of risk was not implicated by the evidence elicited at trial pertaining to the Decedent's decision to go onto the roof of the Cat Car when the pantograph was energized.

## II.

### Locomotive Inspection Act

Congress enacted the Boiler Inspection Act ("BIA") in 1911 to promote " 'the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances . . . .' " *Norfolk & W. Ry. Co. v. Brotherhood of Locomotive Engineers*, 459 F.Supp. 136, 143 (W.D.Va.1978) (quoting H.R. Doc. No.1974, 61st Cong., 3rd Sess. 1 (1911)). "The [BIA] is now known as the [LIA], 49 U.S.C. § 20701 *et seq.*, but the latter act incorporated substantive provisions of the former. Thus, the cases construing the former are still controlling as to the latter." *Bittinger v. CSX Transp. Inc.*, 176 Md.App. 262, 281 n. 5, 932 A.2d 1243, *cert. denied*, 402 Md. 356, 936 A.2d 852 (2007). Presently, the LIA provides, in pertinent part: "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury[.]" 49 U.S.C. § 20701. Unlike the FELA, contributory negligence is not a defense under the LIA and cannot reduce a plaintiff's recovery. *Garcia v. Burlington N. R.R. Co.*, 818 F.2d 713, 715 (10th Cir.1987).

On July 14, 2006, at a hearing on Amtrak's partial motion for summary judgment on Collins' LIA claim, the court ruled in Amtrak's favor, finding as a matter of law that the Cat Car was not a locomotive within the meaning of the LIA. The court ruled:

> I[ am] considering the evidence even most favorable to [Collins] . . ., considering the case law as presented and argued, considering the use to which this catenary car was being put at the time of the injury to [the Decedent], it was

the fact that they had couplers and buffers I do not believe is sufficient under the use for which it was being put at the time of the injury to qualify it as a locomotive under the [LIA]. The motion for partial summary judgment on the issue of the [LIA] will be granted as I find no genuine dispute.... I do not find a genuine dispute as to material fact on the definition of locomotive for which this catenary car was being used at the time of the injury. And I[ will] sign an order to that effect.

Collins complains that the circuit court erred in granting Amtrak's motion for partial summary judgment, because whether the Cat Car constituted a locomotive under the LIA was a factual determination that should have been reserved for the jury. Amtrak responds that summary judgment was proper on Collins' claim under the LIA, because Collins "did not develop, and could not develop, any evidence to demonstrate that the Cat Car was a locomotive, as is required for a claim under the LIA."

Whether summary judgment was granted properly under Rule 2–501 is a question of law. *Walk v. Hartford Cas. Ins. Co.,* 382 Md. 1, 14, 852 A.2d 98 (2004). Consequently, we review a trial court's grant of summary judgment *de novo. Id. De novo* review requires us to determine whether the trial court was legally correct. *Id.* In so doing, "we independently review the record to determine whether there exists any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Id.* Further, "[w]e review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant," here, Amtrak. *Id.*

In *Garcia,* the United States Court of Appeals for the Tenth Circuit addressed the issue of whether an Electromatic Tamper, a railroad maintenance vehicle designed to align tracks, was a locomotive under the LIA.[8] 818 F.2d at 714–15. Re-

---

8. *Garcia* was written before the BIA was recodified as the LIA. Because cases construing the BIA are still controlling as to the LIA, we will refer

viewing the case law that addressed the same issue but in the context of other vehicles, the Court noted that courts "have consistently held that a vehicle will be a locomotive only if it is used as a locomotive." *Id.* at 715.

The Court opined:

A study of the cases reveals two requirements: first, the vehicle must operate on railroad tracks; and second, it must perform a locomotive function.

Numerous courts have held that vehicles that push or pull railroad cars along railroad tracks are locomotives. Even if the pushing and pulling is only along the tracks within the railroad's own yard, the vehicle is acting as a locomotive and, thus, is a locomotive under the [LIA].

*Id.* (citation omitted).

In applying the two requirements, the Court in *Garcia* determined that the Tamper fulfilled the first requirement because it operated on railroad tracks while at the job site and moving to and from the job site. *Id.* Turning to the second requirement, the Court recognized that the Tamper involved only the pushing and pulling of its own "buggies," "a projector buggy which is pushed along the track and a receiver buggy permanently installed on the rear of the Tamper." *Id.* at 715–16. The Court differentiated the pushing and pulling of the Tamper's buggies, which the Tamper did only when performing "its own particular functions" at the work site, from the pushing and pulling of railroad cars normally done by a locomotive. *Id.* at 716. The Tamper, the Court pointed out, did not push or pull anything to and from the job site. *Id.* at 720. Although recognizing that the LIA "should be liberally construed," the Court concluded that the Tamper was not a locomotive for purposes of the LIA, explaining that the LIA's coverage "cannot be extended indefinitely." *Id.*

---

to the statute as the LIA to avoid confusion. *See Bittinger v. CSX Transp. Inc.*, 176 Md.App. 262, 281 n. 5, 932 A.2d 1243, *cert. denied*, 402 Md. 356, 936 A.2d 852 (2007).

In the instant case, it is clear that the Cat Car satisfies the first requirement of a locomotive—it operates on railroad tracks. With regard to the second requirement, however, we conclude that the Cat Car does not perform a locomotive function. There is no evidence in the record that Amtrak used the Cat Car to push or pull railroad cars along railroad tracks at the time of the accident or at any other time that it was employed in Amtrak's service. *Cf. Balt. & Ohio Ry. Co. v. Jackson*, 353 U.S. 325, 329, 77 S.Ct. 842, 1 L.Ed.2d 862 (1957) ("Here *at the time of the injury* it is admitted that petitioner was putting the motor track car to locomotive uses in pulling a hand car used to haul material, tools, and equipment." (Emphasis added)). In fact, on the night and early morning in question, the Cat Car was operating as a maintenance vehicle, used by the crew to take electrical alignment readings. The Cat Car was neither attached to another car, nor was it pulling any other car.

 Collins bases her claim that the Cat Car is a locomotive under the LIA on the fact that it is "self-propelled and equipped with couplers and buffers" and "is specifically designed to pull a companion on-track cable reel railer." She also points out that the Cat Car was equipped with locomotive-style headlights and mirrors. The fact, however, that the Cat Car was designed to perform a locomotive function or was capable of operating as a locomotive does not meet the requirement that it actually performed such function.[9] We

---

**9.** In *Garcia v. Burlington N. R R. Co.*, 818 F.2d 713, 715 (10th Cir. 1987), the Court cited to *United States v. Fort Worth & Denver City Railway Co.*, 21 F.Supp. 916, 918–19 (N.D.Tex.1937), in which it was determined that a crane used to unload boulders at a railroad construction site was a locomotive because it pushed or pulled cars loaded with boulders to and from the construction location. The *Garcia* Court, however, opined: "When the crane was performing its specialized function of lifting boulders and placing them under the tracks, it was not a locomotive. However, it was a locomotive when it performed the separate function of pushing or pulling railroad cars to and from the job site." 818 F.2d at 720. Thus the same vehicle can be a locomotive under the LIA at certain times and cannot be a locomotive at other times, depending on what function it is actually performing. In the case *sub judice*, there was no evidence in the record that the Cat Car

therefore conclude that the trial court did not err in granting Amtrak's motion for partial summary judgment.

## III.

### Admission of Redacted Transcript

During trial, Collins sought to introduce a transcript of an audio transmission between a train dispatcher and Charles Duld, a management employee of Amtrak, recorded on the morning of the Decedent's death. Amtrak, through a motion in limine, sought to exclude the transcript from evidence. In particular, Amtrak requested that one statement from the transcript be excluded—Duld's response to learning that the Decedent and his crew were working under energized wires. The trial court admitted the transcript, but not the challenged statement. The redacted statement followed the train dispatcher's response to Duld's question: "Did they ever ask for the power to be removed?":

TRAIN DISPATCHER: No, there was no plate request up, no.

[DULD]: Ok. Jesus, that's unbelievable. So, those guys went in there and never asked for any power out?

Collins argues that, by ordering the redaction of that language from the transcript without explanation or any "basis for differentiation between the portion of the statement excluded and the portion admitted," the trial court abused its discretion. Amtrak responds that, "[a]lthough the trial judge did not fully explain its reasons for excluding [the statement]," the judge properly excluded the statement in the transcript. Amtrak posits several reasons that the exclusion was appropriate: (1) "the statement was inadmissible as it was solely commentary and opinion evidence from a lay witness who was not called at trial;" (2) the statement was irrelevant; and (3)

---

ever pulled a companion on-track cable reel trailer, and, even if it did, there was no evidence that the cable reel trailer was not integral to the Cat Car's "special work site function," and thus not a locomotive. *See id.* at 720.

the court recognized that Duld's comment was ambiguous and Duld did not testify to explain his statement. Even assuming error, Amtrak contends that such error was harmless, because there was ample evidence introduced at trial that the practice of working under an energized line was unusual, which was the same fact that the redacted statement tended to prove.

In making its ruling, the trial court decided that the transcript was admissible under Rule 5–803(a)(4) or (a)(1), as an exception to the hearsay rule, but stated that the redacted statement fell outside of the rule.[10] The redacted statement, the court noted, "goes over the line."

Even assuming that the redaction of the statement at issue was error, we conclude that such error was harmless, and thus the trial court did not abuse its discretion. *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). The redacted statement, namely Duld's response, "Jesus, that's unbelievable. So, those guys went in there and never asked for any power out?," suggests that it was unusual and rare for a crew to be working under an energized wire. We agree with Amtrak that "[t]here was ample evidence on this point from other sources." Breder, the Cat Car operator on the morning of the accident, testified that 99% of the time his crew worked under a de-energized wire and described working under an energized wire as a "rare occurrence." Nangle testified that the percentage that electric traction employees worked under an energized line versus a de-energized line prior to the Decedent's accident was "minimal but it is done," and agreed that work was done under a de-energized line 90 to 99% of the time.[11]

---

**10.** Collins argues that the court found that "the statement as a whole satisfied the requirements of admissibility found in Maryland Rule 5–803(a)(4) & (a)(1), but nevertheless excluded the stated language without further explanation." We read the court's ruling as admitting all the statements in the transcript under Rule 5–803 but excluding the redacted portion as not within Rule 5- 803.

**11.** The statement also implied that there was a safer alternative available to the crew, namely, requesting the power be turned off and

Collins, however, argues that the redacted portion should have been admitted because the excluded response was relevant to demonstrate that the practice of working under an energized wire "was viewed as very questionable by those Amtrak employees outside of the Mid–Atlantic Division–South." The redacted statement, Collins asserts, implies that the "other areas of Amtrak *never* engaged in the practice," thereby supporting Collins' contention that "the activity should *never* have been allowed." (Emphasis in original). There was, however, evidence at trial that other areas of Amtrak did not engage in the practice of working under an energized wire. Nangle testified that, based on an internal investigation, the Mid–Atlantic Division–South was the only division that did catenary line maintenance under an energized line. Furthermore, the Amtrak Investigation Committee Report, prepared by Amtrak management following the Decedent's accident, stated that the "Mid–Atlantic Division South— including the Perryville and Baltimore Cat Car gangs—is the only area in the Northeast Corridor that manually ties-down pantographs *or checks catenary alignment with the pantograph raised under an energized wire.*" (Emphasis added). Because the record already contains sufficient evidence of Collins' alternative interpretation of the redacted statement, we again conclude that any assumed error was harmless. Accordingly, the trial court did not abuse its discretion in admitting the redacted transcript of the conversation between Duld and the train dispatcher.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY COSTS.**

---

working under a de-energized line. Again, there was ample evidence on that point.